STATE *vs.* MICHAEL X. MOCKUS.

Oxford.    Opinion March 26, 1921.

*Rights of religious freedom and freedom of speech are to be exercised within con-*
*stitutional limitations.   The constitutional limitations of religious freedom*
*are non-disturbance of the public peace and non-obstruction of others in*
*their religious worship, while the constitutional limitation of free*
*speech is only responsibility for that liberty.   Public contumely and*
*ridicule of a prevalent religion not only offends against the*
*sensibilities of the believers, but likewise threatens*
*public peace and order by diminishing the power*
*of moral precepts.*

The respondent was indicted for blasphemy as defined in R. S., Chap. 126,
    Sec. 30.   Upon his arraignment, he entered a general plea of not guilty; upon
    trial, he was found guilty and his case is now before us upon his bill of excep-
    tions.

The first exception relates to the exclusion of a certain book officially known
    as "Senate Document No. 190," which was a report of an ex-President of
    the United States upon conditions in the Philippine Islands.   The book
    was excluded on the ground that it was neither pertinent nor relevant to
    the issue.   The ruling was correct.

His main contention relates to the refusal to give certain requested instructions.
    The first and second of those instructions relate to religious freedom and free-
    dom of speech, both of which are guaranteed by the constitution of this
    State.   The third and fourth instructions are a challenge to the constitu-
    tional right of the Legislature to enact the statute under which the indict-
    ment was found.   The fifth relates to the elements which constitute dis-
    turbance of the public peace.   The sixth relates to an instruction which was
    upon a question of fact.   The seventh and eighth relate to the elements
    which constitute blasphemy.   The ninth, tenth and eleventh relate to mat-
    ters pertaining to criminal pleading.   The twelfth is a request to return ver-
    dict of not guilty.

*Held:*

1.   The constitutional rights of religious freedom and freedom of speech are
    to be exercised within constitutional limitations.   The constitutional limi-
    tations of religious freedom are non-disturbance of the public peace and non-
    obstruction of others in their religious worship, while the constitutional limita-
    tion of free speech is only responsibility for that liberty.   These are broad,
    far reaching limitations and they travel on equal footsteps with constitu-
    tional liberty in whatever paths that liberty may desire to travel.

2.   Public contumely and ridicule of a prevalent religion not only offends
against the sensibilities of the believers, but likewise threatens public peace
and order by diminishing the power of moral precepts.   It is not necessary
that an actual breach of the peace should occur for the use of words tending
to excite or incite a breach of the peace is indictable.

3.   The statute in question has stood as the law of this State for a century.
It found its basis in the Colonial government of Massachusetts in 1646 and
the provincial government in 1697.   Its constitutionality had never before
been challenged in this State.   In considering the act in its relations to the
constitutional declaration of rights, that declaration is to be expounded with
reference to the whole spirit and character of the constitution as a system of
government, to be gathered from all its constituent parts, and from the exist-
ing laws, the known prevailing principles, and other circumstances of the
times in which it was made and adopted.   Acting upon this view, because
it is based upon sound principles and supported by convincing logic, we have
no hesitation in saying that the statute under consideration in no manner
conflicts with our State constitutional guaranty of religious freedom or free-
dom of speech.   The constitutional guaranty found in the Federal consti-
tution has no application to the case at bar for by that guaranty it is only
provided that Congress shall make no law restraining religious freedom or
freedom of speech.   The Federal declaration not only restrains Congress from
enacting any statute restraining religious freedom or freedom of speech, but,
by necessary implication, leaves that matter to be dealt with by the sovereign
power of the several States.

4.   The fifth instruction, while proper in form, was given in the charge of the
presiding Justice although not in the precise words in which it was presented
by the respondent.   This, the court was not bound to do.

5.   The sixth instruction, in part at least, requested an instruction as to a mat-
ter of fact.   A bill of exceptions, to be available must show clearly and dis-
tinctly that the ruling excepted to was upon a point of law and not upon a
question of fact; nor upon a question in which law and fact were so blended
as to render it impossible to tell on which the adverse ruling was based, and
requests for ruling must be free from this ambiguity or the withholding of
them will not be error.

6.   The seventh and eighth instructions were fully covered by the charge of
the presiding Justice although in language other than that in which the requests
were made.

7.   By the ninth, tenth and eleventh instructions, the respondent complained
because the indictment did not charge that the acts complaint of were done
wilfully, maliciously or feloniously, although the charge was made in the words
of the statute.   No attempt was made to take advantage of any irregularity
of the indictment by demurrer.   It is too late to attempt such advantage
by requested instructions and exceptions thereto after a general plea of not
guilty and full trial upon the issues of fact.   Having thus pleaded, and gone
to trial on that plea, all objections to matters of form in the indictment are
waived as they may be raised by motion in arrest of judgment.

8.   The refusal to direct a verdict in favor of the respondent was    correct. Under most careful and complete instructions as to the law governing the case, the jury returned a verdict that the words uttered by the respondent was uttered contumeliously, in a blasphemous manner, and with unlawful intent to expose the holy subjects mentioned in the statute to contempt and ridicule, thus sustaining the view of the presiding Justice upon which he based his refusal to direct a verdict.

On exceptions by respondent.  At the October term 1919, of the Supreme Judicial Court in Oxford County, Michael X. Mockus of Chicago in the State of Illinois, was indicted for blasphemy under Sec. 30, Chap. 126, of the R. S.  The respondent at the invitation of a society of Lithuanians in Rumford Falls, delivered three lectures on the 6th, 8th and 10th days of September, 1919. These lectures were delivered in the Lithuanian language to a large audience in each case accompanied by pictures thrown upon a screen, representing usually Biblical subjects, including the Annunciation, the Crucifixion, and the picture of God as he appeared in the vision of Ezekiel.  As these pictures were thrown upon the screen the respondent commented upon them, in a manner alleged to be blasphemous.  The jury found the respondent guilty and the case was taken to the Law Court on exceptions by respondent to the refusal of the presiding Justice to give certain instructions, and to the exclusion of certain documentary evidence. Exceptions overruled.

The case is fully stated in the opinion.

*Frederick R. Dyer*, County Attorney, for the State.

*Frank A. Morey*, for respondent.

SITTING:   CORNISH, C. J., SPEAR, HANSON, PHILBROOK, WILSON, JJ.

PHILBROOK, J.   The respondent was indicted for a violation of the provisions of R. S., Chap. 126, Sec. 30, which declares that "Whoever blasphemes the holy name of God by cursing, or contumeliously reproaching God, His creation, government, final judgment of the world, Jesus Christ, the Holy Ghost or the Holy Scriptures as contained in the canonical books of the Old or New Testament, or by exposing them to contempt and ridicule, shall be punished" etc.  Upon his arraignment he pleaded not guilty. Trial by jury followed, and he was found guilty.  The case is before

us upon his bill of exceptions, it being stipulated that the indictment, all evidence, and the charge of the presiding Justice are to be printed as part of the exceptions.

The respondent, on the occasion when it is claimed that the offence was committed, was engaged in giving lectures in the town of Rumford, the lectures being illustrated by pictures thrown upon a screen in a darkened room. Quoting from the charge of the presiding Justice; "The State finds no fault whatever with the character of those plates. It is not said that those plates were of indecent subjects, or that they were of such a character as to lead to the slightest foundation for a prosecution of this kind. On the contrary it is freely stated that they were of the highest order, some of them being reproductions of the finest works of art; but the State does complain of the comments which it alleges the respondent made in connection with the exhibition of those pictures. These objectionable expressions, as alleged, group themselves in this indictment under two or three different heads. They pertain particularly to the pictures shown of the Annunciation, of the Crucifixion, and the picture which has been described as a Dove."

The indictment contains eight counts. Each count charges that the respondent "did blaspheme the holy name of God by cursing and contumeliously reproaching God, His creation, government, final judgment of the world, Jesus Christ, the Holy Ghost, and the Holy Scriptures as contained in the Canonical books of the Old and New Testament, and by exposing them to contempt and ridicule, in that in a public address made by him, the said Michael X. Mockus, then and there, in the presence and hearing of divers persons there assembled, did pronounce, publish and proclaim the following blasphemous words, that is to say;" etc. Under each count thus begun the State gave specifications of the words then and there alleged to have been spoken in the Lithuanian language, and a translation of those words into the English language. It is a most embarrassing task to spread those words upon this printed page but it must be done in order to make our findings applicable and justifiable. The specifications, numbered to correspond with the several counts, are as follows, given only in the English language:

1. "Mary (meaning the Virgin Mary) had a beau. When her beau called one evening (both being young) he seduced her.

He brought her a flower and put her in a family way. No woman can give birth to a child without a man."

2. "The father of Christ was a young Jew and was no Angel Gabriel. Any girl who wants a child can call a Gabriel or some John."

3. "Religion, capitalism and government are all damned humbugs, liars and thieves. Those three classes combine into one organization.

.4. "All religions are a deception of the people."

5. "A young man came to Mary during the night, and coming near her with a flower in his hand took her by the hand and said: 'Sh, Sh;' look how the priests teach you, the falsifiers, thieves; it is not possible that he could be of the Holy Ghost, there must be a man. A young Jew was the father of the Christ. No woman can have a child without a man; that never happened and never can happen."

6. "You see the Trinity, (pointing to a picture of God, Jesus Christ and the Holy Ghost, which he had caused to be thrown upon a screen) God the Father, Ghost and Son, a young Jew, but that old man never was and never can be; if he was God from the Ghost, then where did that belly-button come from which is sprouted like a button? Bear in mind that the black army is a trinity, clergy, capitalism and govenment, they govern the world together."

7. "There is no truth in the Bible, it is only monkey business. Religion, capitalism and government are a black army and only profiteer from the poor people. You see here (pointing to a picture of God, Jesus Christ and the Holy Ghost, which he had caused to be thrown upon a screen) scarecrows. Here is God the Father, Son and Ghost, a whole trinity, just as the priest, capitalists and government. How can the Holy Ghost be God when she is afraid a cat will kill her? And do you believe in these scarecrows?"

8. "You see this fool (pointing to a picture of Jesus Christ upon the cross, with the private parts of his body covered with a cloth; which he had caused to be thrown upon a screen) and you believe in Him. The women were sorry for the holy thing and covered the holy thing, while the rest of the body was left uncovered."

Each count in the indictment was concluded with the *contra formam statuti* clause, thus presenting an indictment for statutory blasphemy, yet blasphemy is also a criminal offense at common

law, being defined by Blackstone as denying the being or providence of God, contumelious reproaches of our Saviour Christ, profane scoffing at the Holy Scripture, or exposing it to contempt or ridicule, IV Black, Com. Sharswood Ed., 368. Although our statute defines and punishes the acts complained against in the indictment, yet the common law definitions of, and inhibitions against blasphemy should not be overlooked since they illuminate the statute. In most of the States of this country statutes against this offense have been enacted but these statutes are not understood in all cases to have abrogated the common law, the rule being that where the statute does not vary the class and character of an offense, but only authorizes a particular mode of proceeding and of punishment, the sancton is cumulative and the common law is not taken away. Bouvier, Vol. I, Title, Blasphemy.

As we have already said, the case is before us upon defendant's exceptions, the first being upon exclusion of evidence, and the others upon refusal to give requested instructions. We shall consider them in that order.

The first exception relates to the exclusion of a book known and described as a "Red Pamphlet." It appears that the book was more officially known as Senate Document No. 190, and contained a report of an ex-president of the United States upon certain conditions and things in the Philippine Islands. The court excluded the book on the ground that it was neither pertinent nor relevant to the issue. In support of his exception the respondent argued that the State had this book marked as an exhibit and identified as one of the books sold at the lecture during the delivery of which the alleged indictable language was used. He claimed that the purpose of the State in marking and identifying it was to instill into the minds of the jury a feeling that the respondent was selling pamphlets hostile to the government, and since it was not offered by the State the respondent claimed the right to offer it for the purpose of showing its innocent character. An examination of the record does not sustain the claims of the respondent as to the facts, and as it was so plainly impertinent and irrelevant the exclusion of it was clearly correct.

The requested instructions which the presiding Justice declined to give, except as they appear in the charge, are as follows:

1.  The respondent respectfully requests the court to charge the jury that he had a natural and unalienable right to worship Almighty God according to the dictates of his own conscience, and that he shall not be hurt, molested or restrained in his person, liberty or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience, nor for his religious professions or sentiments, provided he does not disturb the public peace, nor obstruct others in their religious worship.

2.  That the respondent had a right at Rumford on the 6th, 7th, 8th and 10th of last September, in his lectures, to speak freely his sentiments as to the conception of Christ, his disbelief in the pigeon as the Holy Ghost, and is not responsible therefor.

3.  That Sec. 30, of Chap. 125 of the R. S., of this State, under which the indictment herein is drawn, is in conflict with Section 3 and Section 4 of the constitution of the State of Maine and is therefor void.

4.  That Sec. 30 of Chap. 125 of the R. S., of this State, under which the indictment herein is drawn, is in conflict with Article 1 of the amendments of the constitution of the United States and is therefore void.

5.  That the State must prove beyond reasonable doubt that the respondent in expressing his sentiments at said meetings of September 6th, 7th, 8th and 10th was rudely contemptuous and insolent. And if the words uttered by him were his religious professions or sentiments unless he did not actually disturb the public peace or obstruct others in their religious worship, he cannot be found guilty herein.

6.  That the respondent was present at the meetings mentioned in the indictment at the request of the Lithuanian Society at Rumford, and that he did not disturb the public peace nor obstruct any one in his audience in their religious worship.

7.  That the words charged to have been spoken must have been spoken profanely to constitute blasphemy, and if not so spoken the charge cannot be sustained.

8.  That unless the defendant maliciously reviled God or religion on the 6th, 7th, 8th and 10th of September at Rumford at his said lectures, he could not have committed blasphemy.

9.  That there is no allegation in any count of the indictment that the respondent wilfully or maliciously committed the acts

alleged to have been committed by him and are fatally defective by reason thereof.

10. That no count in the indictment contains an allegation that any alleged act mentioned therein was maliciously done, and therefore he cannot be found guilty thereof.

11. That no count in the indictment contains any allegation that said alleged act was feloniously done, and therefore he cannot be found guilty.

12. The respondent requests the presiding Justice to direct the jury, as a matter of law, to return a verdict of not guilty, upon all of the evidence in the case and the law applicable thereto.

It is quite evident that in the third and fourth requested instructions the respondent referred to R. S., Chap. 126, instead of Chapter 125, and we shall regard this error as simply inadvertent.

Before considering these requested instructions in detail we desire to call attention to the various and distinct elements of the statute, a violation of any one of which would be a violation of the law.

To curse God means to scoff at God, to use profanely insolent and reproachful language against Him. This is one form of blasphemy under the authority of standard lexicographers. To contumeliously reproach God, His creation, government, final judgment of the world, Jesus Christ, the Holy Ghost or the Holy Scriptures as contained in the canonical books of the Old or New Testament, under the same authorities, is to charge Him or them with fault, to rebuke, to censure, to upbraid, doing the same with scornful insolence, with disdain, with contemptuousness in act or speech. This is another form of blasphemy. But as particularly applicable, perhaps, to the present case, it is blasphemy to expose any of these enumerated Beings or Scriptures to contempt and ridicule. To have done any one of these things is blasphemy under the statute as well as at common law. It was not necessary for the State to prove that the respondent did them all.

The first requested instruction relates to religious freedom, as vouchsafed by Article I, Section 3, of the Constitution of this State, wherein it is provided that the right to worship Almighty God according to the dictates of one's own conscience shall not be restrained, nor shall one be hurt, molested, not restrained because

of his religious professions or sentiments, provided he does not disturb the public peace not obstruct others in their religious worship.

The second requested instruction relates to freedom of speech, as vouchsafed by Article I, Section 4, of the same constitution, wherein it is provided that every citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty.

In the present case these two requests correlate, the respondent claiming freedom of speech regarding his religious professions or sentiments. We do not understand that upon the occasion in question the respondent claims that he was worshiping Almighty God according to the dictates of his conscience, or that the State by this proceeding is attempting to hurt, molest or restrain him for such worship. These two constitutional rights, within constitutional limits, are not to be violated, destroyed or denied. The rights are always vigorously claimed, but the limitations are not always carefully scrutinized or respected. In a charge which for clearness of thought, beauty of diction, accuracy in law, and impartiality of statement, is seldom equalled, the learned Justice who presided at the trial well said: "The great degree of liberty which we enjoy in this country, the degree of personal liberty which every man and woman enjoys, is limited by a like degree of liberty in every other person, and it is the duty of men, and the duty of women, in their conduct, in the exercise of the liberty which they enjoy, to consider that every other man and woman has the right to exercise the same degree of liberty; that when one person enters into society—and society is the State in which personal liberty exists—each gives up something of that liberty in order that the other may enjoy the same degree of liberty. It is a conception that perhaps some people find difficult to understand, but it is the conception of liberty which we enjoy." The difficult task imposed in most instances is to ascertain, determine, and declare in concrete form, what those limitations are and where they mark the line beyond which one may not cross with safety either to himself or to society.

In this State the constitutional limitations of religious freedom are non-disturbance of the public peace and non-obstruction of others in their religious worship, while the constitutional limitation of free speech is only responsibility for that liberty. These

are broad, far reaching limitations, and they travel *pari passu* with liberty in whatever paths she may desire to travel.

It is farthest from our thought to claim superiority for any religious sect, society or denomination, or even to admit that there exists any distinct, avowed connection between Church and State in these United States or in any individual State, but as distinguished from the religions of Confucius, Gautama, Mohammed, or even Abram, it may be truly said that, by reason of the number, influence and station of its devotees within our territorial boundaries, the religion of Christ is the prevailing religion of this Country and of this State. With equal truth may it be said that, from the dawn of civilization, the religion of a country is a most important factor in determining its form of government, and that stability of government in no small measure, depends upon the reverence and respect which a nation maintains toward its prevalent religion. Within the limits of an opinion it would not be expected that all the tenents of the Christian religion could be expounded, or even enumerated, but for our purpose it will be enough to say that this religion teaches acknowledgement of the existence, presence, knowledge and power of God, as related to human beings in all their walks of life; this religion teaches dependence upon God; this religion teaches reverence toward God and respect for Holy Scripture. Even as we are writing these words the man who is about to assume the duties of the high and responsible station of President of these United States, following the unbroken custom of more than a century, and to the end that his official vow may be more impressive and binding, reverently says: "So help me God," and then pausing, with equal reverence, salutes the Holy Scripture by a kiss. Congress and State Legislatures open their sessions with prayer addressed to the God of the Christian religion. Judicial tribunals, anxious to discover and apply the truth, the whole truth and nothing but the truth, require those who are to give testimony in courts of justice to be sworn by an oath which recognizes Deity. Thus it will be seen that there is acknowledgement of God in each co-ordinate branch of government. Lest any argument in support of the recognition of God in the fundamental law of our State should be overlooked we point to the very preamble of our constitution. "We, the people of Maine, in order to establish justice, insure tranquillity, provide for our

mutual defense, promote our common welfare, and secure to ourselves and our posterity the blessings of liberty, acknowledging with grateful hearts the goodness of the Sovereign Ruler of the Universe in affording us an opportunity so favorable to the design; and imploring His aid and direction in its accomplishment do ordain and establish the following constitution." In view of all these things shall we say that any word or deed which would expose the God of the Christian religion, or the Holy Scriptures, "to contempt and ridicule," or which would rob official oaths of any of their sanctity, thus undermining the foundations of their binding force, would be protected by a constitutional religious freedom whose constitutional limitation is non-disturbance of the public peace? We register a most emphatic negative. In support of this position we quote from Tiedman on State and Federal Control of Persons and Property, Section 65, "Public contumely and ridicule of a prevalent religion not only offends against the sensibilities of the believers, but likewise threatens the public peace and order by diminishing the power of moral precepts." In *State v. Chandler,* 2 Harrington, (Del.), 553, an indictment for blasphemy, the court sustains the doctrine that it was not necessary that an actual breach of the peace should occur, but the use of words tending to excite or incite a breach of the peace is indictable. In *Updegraph* v. *Commonwealth,* 11 S. & R., (Penn.), 394, upon an indictment for blasphemy, the court said in words most applicable to the case at bar, "From the tenor of the words it is impossible to say that they could have been spoken seriously and conscientiously, in the discussion of a religious or theological topic; there is nothing of argument in the language; it was the outpouring of an invective so vulgar and shocking and insulting that the lowest grade of civil authority ought not to be subject to it, but when spoken to a Christian man and to a Christian audience it is the highest offense *contra bonos mores*; and even if Christianity was not a part of the law of the land, it is the popular religion of the country, an insult to which would be indictable as directly tending to destroy the peace." Thus it will be easily seen that in cases like the one at bar the law reaches down through the surface of things to the concealed or dimly concealed, depths of intent. The presiding Justice gave the true rule when he said: "The clear boundary line between the lawful and the unlawful discussion of

religious subjects is the intent with which such discussion is carried on, and with which the words are uttered. If uttered maliciously, with an unlawful intent to ridicule and bring into contempt, as is stated in the statute 'His creation, government, final judgment of the world, Jesus Christ, the Holy Ghost and the Holy Scriptures,' then they are punishable. The gist of the offense is the unlawful intent with which the words are uttered. Were they uttered with an unlawful intent to bring these holy subjects into ridicule and contempt? If they were, then the person who uttered them is amenable to this statute." See *Commonwealth* v. *Kneeland*, 20 Pick., Page 220.

An examination of the charge shows that the presiding Justice fully and correctly gave the substance of the first requested instruction; that the second, asking that the jury be instructed that the respondent "is not responsible" for what he said, was not proper, was correctly refused, and in place of it the proper rule was given.

The respondent takes nothing by exception to the refusal to give these instructions.

The third and fourth requested instructions challenge the right of the Legislature to enact the statute under which the respondent was indicted because of constitutional provisions both State and Federal. In respect to State inhibition, the respondent relies upon Article I, Sections 3 and 4, of our State Constitution, and in respect to the Federal Constitution he relies upon Article 1 of the amendments to the same.

Our Declaration of Rights, adopted one hundred years ago, is the same as that found in the Massachusetts constitution, with respect to religious freedom, and almost immediately after the adoption of our constitution our Legislature enacted the statute against blasphemy which was copied from the Massachusetts statute against blasphemy, with unimportant modifications. The Colonial government of Massachusetts in 1646, and the Provincial government in 1697 made similar provisions defining and punishing blasphemy. The Massachusetts statute, passed soon after the adoption of the Massachusetts constitution, was a revision of the colonial and provincial laws. In the Massachusetts constitutional convention of 1820, called to revise the existing constitution, the subject of religious freedom was freely discussed but, so far as we can learn, no one in that convention even suggested that the

existing statute against blasphemy, passed in 1782, was in violation of the constitutional Declaration of Rights.

In 1838 the Massachusetts court said in *Commonwealth* v. *Kneeland*, supra, that it was somewhat late to call in question the constitutionality of a law of such long standing and which had been repeatedly enforced without doubt as to its constitutionality. We think this view has strong and pertinent application to the case at bar when we consider that during the entire century in which our court has existed no instance can be found in which the constitutionality of our statute against blasphemy has been questioned. But, waiving the doctrines of antiquity and *stare decisis* for a moment, the reasoning of the court in the Kneeland case is so satisfactory that we crave indulgence while we quote somewhat at length from the words of the learned Chief Justice Shaw.

"In order to ascertain whether the statute against blasphemy is contrary to the letter or to the spirit of this constitutional article, it is necessary to ascertain what the statute in fact prohibits, and then see whether the act thus prohibited is one which the article allows. It makes it penal wilfully to blaspheme the holy name of God, etc. The word wilfully, in the ordinary sense in which it is used in statutes, means not merely voluntarily, but with a bad purpose, and in this statute must be construed to imply an intended design to calumniate and disparage the Supreme Being, and to destroy the veneration due to him. It does not prohibit the fullest inquiry, and the freest discussion, for all honest and fair purposes, one of which is the discovery of truth. It admits the freest inquiry when the real purpose is the discovery of truth, to whatever result such inquiries may lead. It does not prevent the simple and sincere avowal of a disbelief in the existence and attributes of a supreme, intelligent being, upon suitable and proper occasions. And many such occasions may exist; as where a man is called as a witness, in a court of justice, and questioned upon his belief, he is not only permitted, but bound by every consideration of moral honesty, to avow his unbelief, if it exist. He may do it inadvertently in the heart of debate, or he may avow it confidentially to a friend, in the hope of gaining new light on the subject, even perhaps whilst he regrets his unbelief; or he may announce his doubts publicly, with the honest purpose of eliciting a more general and thorough inquiry, by public discussion, the true and

honest purpose being the discovery and diffusion of truth. None of these constitute the wilful blasphemy prohibited by this statute."

Taking this to be the true meaning, intent and construction of the statute, the court declared that it was not repugnant to the constitutional Declaration of Rights, and further declared "That the article is to be expounded with reference to every other clause and provision of the constitution, and to its whole spirit and character as a system of government, to be gathered from all its constituent parts, and from the existing laws, the known prevailing principles, and other circumstances of the times in which it was made and adopted." Adopting this conclusion because it is based upon sound principles and supported by convincing logic we have no hesitation in saying that the statute under consideration in no manner conflicts with our State constitutional guaranty of religious freedom and freedom of speech.

The constitutional guaranties found in Article 1 of the amendments to the Federal Constitution have no application to the constitutionality of our statute here being considered, for it is there provided only that Congress shall make no law restraining religious freedom or freedom of speech. Congress did not enact this statute. The Federal Declaration of Rights not only restrains Congress from enacting any statute restraining religious freedom or freedom of speech but, by necessary implication, leaves those matters to be dealt with by the sovereign power of the several States. These exceptions are unavailing to the respondent. *United States* v. *Cruikshank*, 92 U. S., 551; 23 L. Ed., 589.

The fifth requested instruction was proper in its form, but examination of the charge, especially in the light of what we have already said as to what may constitute disturbance of public peace, shows that all the elements of the instruction were given, although not in the precise words in which it was presented by the respondent. This court was not bound to do. *Anderson* v. *Bath*, 42 Maine, 346, *State* v. *Reed*, 62 Maine, 129.

The sixth requested instruction was not proper because, in effect, the Justice presiding was requested, in part at least, to instruct as to a question of fact. "A bill of exceptions, to be available, must show clearly and distinctly that the ruling excepted to was upon a point of law, and not upon a question of fact; nor upon a question in which law and fact were so blended as to render it

impossible to tell on which the adverse ruling was based. And requests for ruling must be free from this ambiguity, or the withholding of them will not be error." *Laroche* v. *Despeaux*, 90 Maine, 178. Moreover the first part of the request related entirely to matter entirely immaterial to the issues involved in the case.

The seventh and eighth requested instructions were fully covered by the charge, although in language other than that in which the requests were made. It is not necessary to repeat what we have just said when discussing the fifth requested instruction.

The ninth, tenth and eleventh requests relate to matters of pleading, and are based upon the omission of words which charge that the acts complained of were done wilfully, or maliciously, or feloniously. No attempt was made to take advantage of any matter of form by demurrer. It is too late to attempt such advantage by requested instructions after plea of not guilty and full trial upon the issues of fact. Having appeared generally and pleaded not guilty he thereby waived all objections to matters of form in the indictment except as they may be raised by motion in arrest of judgment. *State* v. *Regan*, 67 Maine, 380; *Commonwealth* v. *Henry*, 7 Cush., 512; *Commonwealth* v. *Gregory*, 7 Gray, 498.

Finally the respondent requested the presiding Justice, as matter of law, to direct a verdict of not guilty upon all the evidence in the case and the law applicable thereto. This request was denied and properly so. The testimony is voluminous and has received most careful examination. The respondent was charged with blasphemy. One form of blasphemy is to expose the beings and Scriptures, mentioned in the statute, to contempt and ridicule. Some of the statements of the respondent have been set forth in the various counts of the indictment and the testimony is plenary in support of the charge that he made these statements. The record discloses that as he spoke his auditors laughed and clapped their hands. Under most careful and complete instructions the verdict of the jury was that the words uttered by the respondent were uttered contumeliously, in a blasphemous manner and with unlawful intent to expose the Holy subjects mentioned in the statute to contempt and ridicule. The ruling of the presiding Justice was justified.

*Exceptions overruled.*

*Judgment for the State.*