ASSOCIATION OF INDEPENDENT
PROFESSIONALS and Dennis
McConnell

v.

The MAINE LABOR RELATIONS
BOARD and Associated Faculties
of the University of Maine.

Supreme Judicial Court of Maine.

Argued Nov. 1, 1982.

Decided Aug. 30, 1983.

Bryan M. Dench (orally), Skelton, Taintor & Abbott, P.A., Lewiston, for Association of Independent Professionals.

Stephen P. Sunenblick (orally), Sunenblick, Fontaine & Reben, Portland, for Associated Faculties of the U. of M.

Wayne W. Whitney, Jr. (orally), Maine Labor Relations Board, Augusta, for defendants.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, CARTER* and VIOLETTE, JJ.

ROBERTS, Justice.

The Association of Independent Professionals [AIP] and Dennis McConnell appeal from a judgment of the Superior Court, Kennebec County, denying their complaint for direct review of governmental action pursuant to M.R.Civ.P. 80B and affirming an order of the Maine Labor Relations Board [MLRB]. Of the issues appellants raise, we consider dispositive the question whether the Board has impermissibly infringed upon the first amendment rights of persons subject to the Board's order. Because we answer in the affirmative, we remand to the Superior Court with instructions to vacate the Board's order.

## I.

In 1975, the Maine Legislature extended collective bargaining to University of Maine employees through the University of Maine Labor Relations Act, 26 M.R.S.A. §§ 1021–1035 (Supp.1982–1983) [Act]. On May 11, 1978, the Associated Faculties of the University of Maine [AFUM] was certified as the bargaining agent for the University of Maine faculty bargaining unit. AFUM is affiliated with the Maine Teachers Association and the National Education Association. The bargaining unit is comprised of the faculty and professional staff on the various University of Maine campuses who number approximately 950. Section 1027(3) of the Act provides that: "Nothing in this chapter shall be interpreted to prohibit the negotiation of union security, excepting closed shop."

On September 14, 1979, following more than a year of negotiations, AFUM and the University entered into a collective bargaining agreement enforceable until June 30, 1981. The "Checkoff and Maintenance of Membership" provisions under Article 13 paragraph A of the agreement provide for fee options as follows: "A. Unit members shall ... elect one of the following alternatives: a) membership in the Association; b) payment of a representation fee; c) payment to an education fund." Paragraph B of Article 13 provides that AFUM members may resign from membership during the period of August 15 to September 15 of each year. Paragraphs C and D provide that the representation fee shall be an amount equal to 95 percent of the membership dues and that the education fund payment shall be an amount equal to the annual membership dues.[1]

Some faculty members failed to select any of the fee options provided by Article 13(A) of the agreement. In the fall and winter of 1979, AFUM sent letters threatening legal action if a fee was not paid under one of the options. In the summer of 1980 AFUM filed collection suits in the Superior Court, Cumberland County, against delinquent faculty members.

■ In its decision now before us, the MLRB found that AFUM's threats of legal action caused some faculty members who were opposed to selecting a fee option to meet in January of 1980. These faculty members formed AIP with the goal of acting as a focal point for information on available alternatives to Article 13. According to one member, AIP is "a rather loose-knit group of people who have actually one common purpose—to try to maintain their independence from the Union." AIP has no formal organization, no dues, no constitution, no by-laws, and no regular meetings. "[A]t any point in time the group is comprised of people who happen to stop by at the meetings...." AIP does have a bank account (funded by donations), a letterhead, and a steering committee. In the period preceding this action AIP issued newsletters, held open meetings, sent mailings to faculty members, and spoke informally with faculty members regarding the

---

* Carter, J., sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

1. At the time of the MLRB decision membership dues amounted to $161.00 per year.

fee options.[2] Appellant Dennis McConnell is co-chairman of AIP.

Evidently in response to various activities that AIP and its members engaged in during the six months following its first meeting, AFUM filed a prohibited practice complaint with the MLRB pursuant to 26 M.R. S.A. § 1029(2) in October of 1980 naming AIP and the National Right to Work Committee/Legal Defense Foundation [Foundation] as defendants.[3] In pertinent part, the complaint requested the MLRB to order the defendants (1) "to cease and desist from disseminating information authorizing the violation of a legally binding and valid collective bargaining agreement" and (2) "to affirmatively rescind their Notice dated September 5, 1980 and issue a mailing to all unit members that their prior advice was unlawful and in violation of the ... Act...." Specifically, the complaint alleged that on September 5, 1980 defendants violated the Act by distributing a change of status notice to the University faculty that indicated that faculty members could properly choose none of the fee options provided in Article 13 of the collective bargaining agreement. (This choice of no option has been labeled the "fourth option.") AFUM further alleged that the defendants' distribution of the notice induced a breach of the collective bargaining agreement and interfered with the rights of employees guaranteed under 26 M.R.S.A. § 1023.[4]

On August 19, 1981, following a lengthy hearing and the submission of briefs, the MLRB issued a decision pursuant to 26 M.R. S.A. § 1029. As a preliminary matter, the Board first determined that AIP is a "university employee organization" and the Foundation a "person" within the meaning of the Act. The Board, thereby, derived its jurisdiction pursuant to section 1029. The Board's conclusion that AIP was an "employee organization" was based on the following discussion:

An organization is an "employee organization" if it engages in "some attempt to discuss or treat with the employer, or to persuade or petition him" with regard to a labor relations matter.... Among AIP's activities has been the mailing of a letter in April, 1980 to the University Chancellor requesting that the University take the position in contract negotiations with the professional staff bargaining unit that all members of that unit be given the option to choose whether or not to participate in a labor organization. The letter also sets forth the reasons for AIP's request.

This letter constitutes an attempt by AIP to persuade or petition the University with regard to a labor relations matter. While the letter concerns negotiations for another bargaining unit, we infer that one purpose of the letter was to introduce the University to AIP's objections to union security clauses, with an eye to persuading the University to resist incorporating Article 13 in future contracts with the faculty bargaining unit. In any event, AIP clearly has attempted

---

**2.** Despite its informal organization, AIP derives capacity to maintain this action from 26 M.R. S.A. § 1032 which provides:

§ 1032. Suits by and against unincorporated employee organizations

In any judicial proceeding brought under this chapter or to enforce any of the rights guaranteed by this chapter, any unincorporated employee organization may sue or be sued in the name by which it is known.

**3.** Dennis McConnell answered the complaint *pro se* on behalf of both himself and AIP. There was no objection that McConnell lacked the capacity to answer on behalf of AIP. Although McConnell was not named as a party defendant in AFUM's complaint, he is specifically named in the Board's order. Because we

vacate the Board's order, we need not decide whether the Board properly included McConnell in its order.

**4.** Title 26 M.R.S.A. § 1023 (Supp.1982–1983) reads in pertinent part as follows:

No one shall directly or indirectly interfere with, intimidate, restrain, coerce or discriminate against university ... employees or a group of university ... employees in the free exercise of their rights, hereby given, voluntarily to join, form and participate in the activities of organizations of their own choosing for the purposes of representation and collective bargaining, or in the free exercise of any other right under this chapter.

to persuade the employer with regard to union security clauses for University employees. We accordingly conclude that AIP is a "university employee organization" subject to the prohibitions set forth in Section 1027(2).

(Citation omitted.)

On the merits, the Board dismissed the complaint against the Foundation on the basis that the Foundation did not advise or assist McConnell or AIP with regard to the change of status form nor provide AIP with any financial assistance for its activities. AFUM did not seek judicial review of the dismissal of its complaint against the Foundation. The Board found that AIP and McConnell had engaged in a prohibited practice and ordered them to cease and desist from

distributing false and misleading information to members of University of Maine bargaining units about the affiliation options provided by Article 13 of the collective bargaining agreement between the Associated Faculties of the University of Maine and the University.

The decision and order also included, *inter alia,* the following findings of fact. Shortly after the January 1980 meeting, McConnell contacted the Foundation in Virginia to inquire about legal assistance if he was sued for failing to select a fee option. One of the Foundation's staff attorneys visited at the Orono campus in February of 1980 with faculty members who were concerned about collection suits. The attorney explained that the Foundation provided free legal assistance upon request, and distributed retainer forms.

Later that month, in a memorandum sent to faculty and professional staff, AIP announced a March meeting to discuss legal defense resources. At the March meeting, McConnell explained to the twenty-five to forty people attending, that AIP had obtained financial and legal support to assist anyone threatened with legal action and outlined the procedures required of individuals desiring to secure such assistance. In April, AIP's steering committee sent a letter to the faculty and professional staff which stated that there may be some alternatives to the fee options under the contract and that AIP would assist any faculty member who was sued.

On August 4, 1980, AIP distributed a newsletter to approximately ninety percent of the University faculty announcing another meeting with Foundation attorneys to provide information to faculty members desiring legal assistance. The meeting, held on August 6, proceeded in substantially the same manner as the March meeting. Twenty-five to thirty people attended this August meeting.

On September 5, 1980, McConnell distributed the following flyer from AIP to approximately 500 faculty members at the Orono campus through the campus mail system:

TO: All Faculty September 5, 1980
FROM: Association of Independent Professionals
SUBJECT: Change of Status Notice to AFUM/MTA/NEA and Payroll Office

If you desire to change your status with respect to the faculty union, you may use the forms provided below. After providing the response appropriate to your circumstances, separate the two notices, fold and tape each form, and place the notices in campus mail. To ensure the proper recording of the notices upon receipt, you may want to make a copy of the notices for your files before mailing.

------------------------------------------------------------------------

### CHANGE OF STATUS NOTICE TO AFUM

TO: AFUM/MTA/NEA

This is to advise AFUM/MTA/NEA of my decision to change the nature of my affiliation with the union. My current status is recorded on either the AFUM/MTA/NEA membership application form or the payroll deduction form, which gave my authorization to deduct either a representation fee or an education fund fee. In accordance with Section B,

Article 13 of the agreement between AFUM/MTA/NEA and the University, I hereby change the original selection to the indicated form of affiliation below.

A. If Currently a Member of AFUM (select one option, and sign below)

_____ resign from AFUM membership, and choose neither of the alternative forms of affiliation.

_____ resign from AFUM, and choose the representation fee alternative.

_____ resign from AFUM, and choose the education fund alternative.

B. If Currently Paying a Representation Fee (select one option, & sign below)

_____ terminate authorization for payment of a representation fee and initiate authorization of payroll deduction for payment to the education fund.

_____ terminate authorization for payment of a representation fee and choose neither of the alternative forms of affiliation. .

C. If Currently Paying an Education Fund Fee (select one option, & sign below)

_____ terminate authorization of payment to the education fund, and choose neither of the alternate forms of affiliation.

I have informed the University of this action, and advised the appropriate officials of the required payroll deduction changes.

Signature_____

Name Printed_____

Date *_____

* Members (A) may resign only between 15 Aug. and 15 Sep. Nonmembers (BAC) may alter their status at any time.

---

## CHANGE IN PAYROLL DEDUCTION AUTHORIZATION

TO: Dale MacDonald (E/W 111)

FROM: _____

SUBJECT: Change in Authorization of Payroll Deduction for Union Dues, Representation Fee, or Education Fund

I have advised AFUM/MTA/NEA of my decision to change the nature of my affiliation. Please make the change indicated below so that my payroll deduction is consistent with my change in status.

A. If Currently a Member of AFUM (select one option, and sign below)

_____ DISCONTINUE DEDUCTION FOR MEMBERSHIP DUES; NO FURTHER DEDUCTIONS ARE AUTHORIZED

_____ DISCONTINUE DEDUCTION FOR AFUM MEMBERSHIP DUES; BEGIN DEDUCTIONS FOR REPRESENTATION FEE

_____ DISCONTINUE DEDUCTION FOR AFUM MEMBERSHIP DUES; BEGIN DEDUCTIONS FOR EDUCATION FUND FEES

B. If Currently Paying a Representation Fee (select one and sign below)

_____ DISCONTINUE DEDUCTION FOR REPRESENTATION FEE; BEGIN DEDUCTIONS FOR EDUCATION FUND

_____ DISCONTINUE DEDUCTION FOR REPRESENTATION FEE; NO FURTHER DEDUCTIONS AUTHORIZED

C. If Currently Paying an Education Fund Fee (select one and sign below)

_____ DISCONTINUE DEDUCTION FOR EDUCATION FUND; NO FURTHER DEDUCTIONS ARE AUTHORIZED.

Signature_____

Date *_____

* If not a member of AFUM/MTA/NEA, you may rescind payroll authorization any time

McConnell prepared and typed the flyer, and included on the back the appropriate names and addresses for mailing any change of status. McConnell also sent sample copies to AIP supporters at the University's Southern Maine, Farmington, and Presque Isle campuses.

As "[a] result of the flyer" the Board found that:

AFUM lost some funds, some AFUM members decided to terminate their membership, additional paperwork was created, and AFUM members and staff spent time trying to encourage people to select one of the three contract options. The flyer also created some confusion among AFUM members. Although the flyer states that it is from the Association of Independent Professionals, some AFUM members thought the president of AFUM had sent the form out, and were confused about the "fourth option" presented in the form—that of not choosing any of the 3 options set forth in Article 13(A).

Specifically, in terms of numerical impact, the Board also found that:

Eleven faculty members, 6 of whom utilized the form distributed by AIP, changed their affiliation status during the August 15 to September 15 "window period." Nine persons, five of whom had been members of AFUM, terminated their payments and chose neither of the alternative forms of affiliation. The other two faculty members terminated their membership in AFUM and chose the representation fee option.

Based on its findings of fact the MLRB reached a number of conclusions. First, the Board concluded that the September 5 change of status notice violated 26 M.R.S.A. § 1027(2)(A)[5] because it contained false and misleading information with regard to fee options available under the collective bargaining agreement. Specifically, the MLRB concluded that the agreement did not authorize the so-called "fourth option." The MLRB further concluded that "[t]he misleading information contained in the notice interfered in violation of Section 1027(2)(A) with the rights of those bargaining unit members who chose to maintain their membership in AFUM or their original selection of one of the other affiliation alternatives."

The MLRB found unpersuasive AIP's contention that it did nothing more than merely express opposition, without any intention of interfering with employees' rights. Rather the MLRB emphasized that AIP "distributed to about 500 unit members false and misleading information designed to confuse unit members . . . and to undermine the authority and disrupt the operations of the bargaining agent."[6] Moreover, the Board concluded "proof of intent to influence the exercise of employee rights is not required for a violation of Section 1027(2)(A); the test is whether under the circumstances the conduct reasonably tends to interfere with the employees in the free exercise of their Section 1023 rights."

The Board also rejected AIP's first amendment defense of the notice: "Misrepresentations which interfere with or coerce employees in the free exercise of their guaranteed rights are 'without the protection of the First Amendment,' *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618 [89 S.Ct. 1918, 1942, 23 L.Ed.2d 547] (1969)." The Board did, however, limit its first amendment conclusion to the notice: "[A]ll other of [AIP's] activities shown by the record in this case are entirely proper and well within the protection of the First Amendment. Only when AIP ventured into misrepresenting the options provided by Article 13 did it step into an impermissi-

---

**5.** 26 M.R.S.A. § 1027(2)(A) reads in pertinent part as follows:

University employees, university employee organizations, their agents, members and bargaining agents . . . are prohibited from:

A. Interfering with, restraining or coercing employees in the exercise of the rights guaranteed in section 1023 or the university . . . in the selection of their representatives for the purposes of collective bargaining or the adjustment of grievances. . . .

**6.** *See infra* note 8.

ble area and lose its First Amendment shield."

Finally, the Board rejected the Foundation's suggestion that the notice was proper because Article 13 is an invalid clause:

Regardless whether Article 13 is valid or invalid, the notice still misrepresents the options provided by the clause. If the clause is invalid, the proper procedure for AIP and its supporters is to challenge the clause in a judicial proceeding, as is being done in the cases before the Cumberland County Superior Court, not to represent to other unit members that the clause provides a fictitious "fourth option."

On September 3, 1981, AIP and Dennis McConnell filed a timely complaint for review of governmental action pursuant to M.R.Civ.P. 80B in the Superior Court, Kennebec County. Plaintiffs named the MLRB as defendant[7] and assigned several grounds for finding error in the Board's decision and order. Specifically, the complaint alleged, *inter alia,* that the Board: (1) erroneously determined that it had jurisdiction over plaintiffs; (2) erroneously determined that the notice was false and misleading and thereby constituted interference, restraint, or coercion of university employees in exercising their rights under section 1023 of the Act; (3) misapplied section 1023 of the Act; (4) based its decision on insufficient evidence in the record; (5) based its decision on invalid provisions of the collective bargaining agreement insofar as the provisions amounted to an unlawful union security agreement; and (6) issued a decision and order which violated both the first and fourteenth amendments of the United States Constitution.

Following a hearing and submission of briefs, the Superior Court entered a brief decision and order denying the petition for review of governmental action and affirming the Board's decision. *Association of Independent Professionals and Dennis McConnell v. The Maine Labor Relations Board and Associated Faculties of the University of Maine,* No. CV 81–418 (Me.Super Ct., Ken.Cty., Mar. 5, 1982). The Superior Court ruled that the evidence in the record was sufficient to support the findings upon which the Board based its conclusion of an unfair labor practice. In addition, the Superior Court ruled that the Board's order did not exceed constitutional bounds. The court also noted that "the constitutionality of Article 13 is not directly before the Court in this proceeding." At the end of March, 1982, appellants filed a timely notice of appeal to the Law Court.

## II.

On appeal to this Court the parties present an array of constitutional arguments ranging from the field of federal labor law to defamation. Much of the confusion results from AIP's broad characterization of the Board's order. AIP argues, *inter alia,* that the order constitutes a presumptively unconstitutional prior restraint on speech or, in the alternative, is fatally overbroad because it potentially subjects to contempt proceedings every faculty member who might speak erroneously about the collective bargaining agreement between AFUM and the University. Because we reject any such broad characterization of the Board's order, we need not decide the issues raised by either of these two arguments.

In ordering AIP to "cease and desist from distributing false and misleading information," the Board concluded that "under the circumstances" distribution of the notice "reasonably tend[ed] to interfere with the employees in the free exercise of their Section 1023 rights," in violation of section 1027(2)(A). The Board also concluded that the notice contained "false and misleading information designed to confuse unit members about the options under the contract and to undermine the authority and disrupt

---

**7.** On December 29, 1981, AFUM was granted leave to intervene as a party defendant in the action.

the operations of the bargaining agent."[8] As we noted above, however, the Board was careful to limit its order to the notice, affirmatively stating that AIP's other activities were "entirely proper" and "well within the protection of the First Amendment." In our view, the Board's order is and was intended to be quite narrow in scope—directed only at the dissemination of misinformation with respect to whether Article 13 itself authorizes the so-called fourth option. The Board correctly recognized AIP's freedom to engage in other activities including dissemination of information with respect to resistance to Article 13. Hence, we reject AIP's broad characterization of the order and consequently, AIP's analysis of the legal issues in this case.

■ We agree with the Board's conclusion that distribution of the flyer constituted a practice prohibited by section 1027(2)(A). Nevertheless, even though we view the order within the narrow scope we believe the Board intended, we must vacate the Board's order because the evidence in this case is insufficient to support the Board's restriction on constitutionally protected interests. In our view the Board's order raises, and we need decide, only this relatively narrow constitutional issue of whether the order constitutes an impermissible restriction on first amendment rights. We do not find that the record before us generates any issues with respect to the validity of Article 13 and, for the purposes of our decision today, we express no opinion concerning that provision. We further note that because of the controlling authority of the federal constitution, we also do not reach any issue under the Maine Constitution. Hence, for the reasons set forth below, we hold that the Board's order violates the first amendment as incorporated into the fourteenth amendment of the United States Constitution.

### A.

■ We first address and affirm the Board's determination with respect to jurisdiction. *See supra* note 6. The Act clearly empowers the Board "to prevent any person, the university, any university employee, any university employees organizations . . . from engaging in any of the prohibited acts enumerated in section 1027." 26 M.R.S.A. § 1029(1). The Act further empowers the Board, after hearing and argument, to issue, upon a preponderance of the evidence, an order requiring an offending party to cease and desist from a prohibited practice. 26 M.R.S.A. § 1029(3). We agree with the Board's reasoning and conclusion that AIP is a "university employee organization" within the meaning of the Act. Finally, because the Act also clearly provides for Superior Court and Law Court review, upon a timely complaint, of a Board decision or order, 26 M.R.S.A. § 1029(7), we do not hesitate to address the merits on appeal.

### B.

■ Ordinarily, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Thus, any government restrictions on freedom of expression aimed at the content of communication presumptively violate the first amendment. L. Tribe, *American Constitutional Law* § 12–2, at 581 (1978). There can be no question that the Board's order implicates the first amendment interests of persons associated with AIP. The United States Supreme Court has acknowledged that first amendment guarantees extend to teachers within the public school context. *See, e.g., Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), including dissident teachers in matters relating to

---

**8.** In the context of the Board's conclusions, the word "designed" does not signify that AIP intended to confuse or mislead. Rather, we understand that the Board meant that the flyer was misleading because of the manner in which it was structured.

labor relations. *Perry Education Assn. v. Perry Local Educators' Assn.,* —— U.S. ——, ——, 103 S.Ct. 948, 961, 74 L.Ed.2d 794, 812 (1983) (Brennan, J., dissenting) (citing *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 176 n. 10, 97 S.Ct. 421, 426 n. 10, 50 L.Ed.2d 376 (1976)).

 Having first determined that AIP may properly invoke a constitutional objection to the Board's order, we must next ascertain the applicable standard of review. "For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Education Ass'n,* —— U.S. at ——, 103 S.Ct. at 955, 74 L.Ed.2d at 804 (citing *Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980)). This standard requires the most strict and most rigorous scrutiny of the Board's order. *See Perry Education Ass'n,* —— U.S. at ——, 103 S.Ct. at 966, 74 L.Ed.2d at 818 (Brennan, J., dissenting); *Perry Local Educators' Ass'n v. Hohlt,* 652 F.2d 1286, 1292–97 (7th Cir.1981) (Wisdom, J.), *rev'd sub nom. Perry Education Ass'n,* —— U.S. ——, 103 S.Ct. 948, 74 L.Ed.2d 794.[9]

 Given this standard of review, we hold that neither the Board's findings of fact nor the evidence in the record is suffi-cient to support the Board's restriction on the freedom of expression of persons associated with AIP. Before us the appellees argue that a compelling state interest provides sufficient support for the Board's restriction on first amendment rights. This analysis focuses upon the preservation of labor peace and the related goals of avoiding disruption of a public institution and preventing the employee confusion and harm associated with the dissemination of false and misleading employment-oriented information. In the particular context of this case, however, we are not persuaded that any of these concerns approach the level of immediacy requiring, of necessity, a content-based restriction on first amendment rights.

The United States Supreme Court has acknowledged that in some circumstances restrictions on certain first amendment conduct may reasonably be considered a means to achieve the state's legitimate interest in insuring labor peace and stability. *See, e.g., Perry Education Ass'n,* —— U.S. at ——, 103 S.Ct. at 959, 74 L.Ed.2d at 809; *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The state has a compelling interest in avoiding disruption, through labor activi-

---

**9.** The Board's restriction clearly relates to the *content* of the notice as opposed to the *forum* of the expression. *See* L. Tribe, *supra* §§ 12–20 to –21, at 682–93. *Content-oriented* restrictions refer to discrimination based on subject matter or viewpoint and aimed at controlling communicative impact. *See Perry Local Educators',* 652 F.2d at 1294–95; L. Tribe, *supra* § 12–2, at 582. "Viewpoint discrimination is censorship in its purest form...." *Perry Educ. Ass'n,* —— U.S. at ——, 103 S.Ct. at 964, 74 L.Ed.2d at 815 (Brennan, J., dissenting). *Forum-based* discrimination refers to restrictions on expression in a particular setting. *See Perry Local Educators',* 652 F.2d at 1294–95. Such forum-based restrictions frequently involve limited access to a particular place or channel of communication, such as mailboxes. *See id.* The United States Supreme Court has applied a somewhat less rigorous standard of review to content-neutral, forum-based restrictions on expression. *See* L. Tribe, *supra* §§ 12–20 to –21, at 682–93; *see also Perry Educ. Ass'n,* —— U.S. at ——, 103 S.Ct. at 954–58, 74 L.Ed.2d at 804–08. This "content-forum" dichotomy forms the basis upon which Justice White, writing for the majority in *Perry,* diverges from the analysis followed by Justice Brennan, in his dissenting opinion, and Judge Wisdom, writing for the Seventh Circuit. *See id.* —— U.S. at ——, 103 S.Ct. at 964, 74 L.Ed.2d at 816. We distinguish Justice White's opinion, which used a "forum" analysis to uphold a restriction on mailboxes, from the case at bar which involves the "content" of a particular communication. Hence, for the purposes of our analysis we follow the reasoning of Justice Brennan and Judge Wisdom. We note that neither AFUM nor the Board pursued any argument with respect to AIP's use of the University's campus mail system, thus never generating an issue concerning an access restriction for a limited public forum. *See* L. Tribe, *supra* § 12–21, at 688–91.

ties, of a state-funded, public institution—in this case the University of Maine. On this record, however, there is insufficient evidence that the notice threatened either labor stability within the University system or disruption of the school environment.[10] The appellees furnished no evidence of specific interference with University operations that resulted, or is likely to result, from the notice. Nor did the notice advocate a work stoppage. *See Perry Local Educators'*, 652 F.2d at 1301. Further, the notice impacts, if at all, primarily upon AIP's rival—the union—and not on the day to day workings of the University. Although any adverse union impact might eventually adversely affect the University in the form of labor instability, this vicarious impact is obviously less immediate than in the case of direct disruption of University functions.

Moreover, the Board's order also clearly fails to adopt the least restrictive means to accomplish any perceived need to prevent instability. The order goes beyond prohibiting the use of the defective flyer. Even when the state can show a sufficiently compelling need to restrict speech, that restriction must be "narrowly drawn" so that it is both the most "efficacious" means to achieve permissible governmental objectives and narrowly aimed at those permissible objectives to prevent unnecessary restriction of protected expression. L. Tribe,

*supra* § 12–8, at 602–03. *"Whenever the harm feared could be averted by a further exchange of ideas, governmental suppression is conclusively deemed unnecessary.* ... [W]henever 'more speech' could eliminate a feared injury, more speech is the constitutionally mandated remedy." *Id.* (Emphasis in original.) In our view, AFUM's complaint is particularly suited to such a remedy. To the extent that the notice might have confused faculty members, the Board could have ordered AIP to circulate an ameliorative notice. The University setting is designed and established for the purpose of freely expressing and exchanging ideas and many faculty members regularly associate for that purpose. Hence, "more speech," not restricted speech would appear the obvious remedy in this case. In fact, this is the precise remedy that AFUM requested in its second prayer for relief.[11]

Our conclusion is not affected by the public sector context of this dispute. The Seventh Circuit noted "the erosion of the notion that public employment is a 'privilege' to which some constitutional guarantees may be inapplicable." *Perry Local Educators'*, 652 F.2d at 1289 (footnote omitted). It would appear that in its role as employer, the state is subject to, at least, the same constitutional restraints that would apply to a similarly situated private employer. *See id.* at 1291. Further, the

---

10. Justice White noted that the Seventh Circuit, when scrutinizing the access restrictions to the mail system, incorrectly required both a showing in the record of past disturbances and evidence that future disturbance was likely. *Perry Educ. Ass'n,* —— U.S. at —— n. 12, 103 S.Ct. at 959 n. 12, 74 L.Ed.2d at 809 n. 12. The Court went on to state that: "We have not required that such proof be present to justify the denial of access to a non-public forum on grounds that the proposed use may disrupt the property's intended function." *Id.* (citing *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976)). By way of rebuttal, Justice Brennan's dissent quotes language from *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and additional cases, which Justice Brennan contends "establish that the state must offer evidence to support an allega-

tion of potential disruption in order to sustain a restriction on protected speech." *Perry Educ. Ass'n,* —— U.S. at —— n. 11, 103 S.Ct. at 968 n. 11, 74 L.Ed.2d at 820–21 n. 11; *see also Perry Local Educators'*, 652 F.2d at 1300–01. Again we distinguish Justice White's opinion as limited to a forum-based analysis. Hence, given the content-based restriction in the case at bar, we believe the correct approach is to require a showing of past or probable future disruption. *See Healy v. James,* 408 U.S. 169, 189–91, 92 S.Ct. 2338, 2350–51, 33 L.Ed.2d 266 (1972). "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker,* 393 U.S. at 508, 89 S.Ct. at 737; *see also* L. Tribe, *supra* § 12–8, at 603 n. 5.

11. *See supra* page 404.

state's interests as an employer in regulating the speech of its employees do not differ significantly from those it possesses with respect to regulation of the speech of the citizenry generally. *Pickering v. Board of Education of Township High School District 205,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In short, with respect to first amendment rights, the courts have treated public and private employees similarly.

We reach our decision despite the validity of the Board's conclusion that the notice constituted "false and misleading information designed to confuse unit members" and that distribution of the notice constituted conduct which "reasonably tends to interfere with" or "coerce" employees in the free exercise of their section 1023 rights. While some misrepresentations are, indeed, "without the protection of the First Amendment," the conduct of AIP hardly falls within this limited category. The Supreme Court held in *Gissel* that the first amendment does not protect "anti-union" communications made by *employers* to employees that contain a "threat of reprisal or force or promise of benefit." *Gissel Packing Co.,* 395 U.S. at 618, 89 S.Ct. at 1942. *Gissel* arose in the context of a nascent and spirited union organizational drive, where the employer conveyed to the employees the belief that the plant would close should the union succeed.

In the case at bar, the employees are already represented by a well-organized, nationally affiliated union. The alleged misrepresentations came from fellow employees, not from an employer acting from a superior bargaining position. By the Board's own conclusion, the notice only "tended" to interfere with section 1023 rights. There was no finding of actual interference with those rights. Nor was there any finding of intentional or knowing misrepresentation.[12] In fact, in our view, prior to the conclusion of any litigation with

respect to Article 13, the notice was only *arguably* false. At best, the notice confused some faculty members—à problem easily remedied by a corrective notice as described above. The Supreme Court has held that "absent proof of false statements knowingly or recklessly made" a public school teacher's statement on matters of public concern and importance must be accorded first amendment protection. *Pickering,* 391 U.S. at 574, 88 S.Ct. at 1737. The Board made no finding of knowing or reckless falsity and, in our view, no such finding would be supported by the record.

Finally, we emphasize that our decision upon the particular circumstances of this case does not undermine the Board's statutory authority to protect the employee collective bargaining rights guaranteed under 26 M.R.S.A. § 1023. We hold only that the Board's order under these circumstances exceeded the limitations imposed by federal constitutional law. The Board may, if deemed appropriate in spite of the lapse of time, prohibit the use of the flyer or require AIP to distribute corrective notices clearly indicating that "option four" is not one expressly provided by Article 13.

The entry is:

Judgment vacated.

Remanded to the Superior Court with instructions to set aside the order of the Maine Labor Relations Board and to remand the case to the Board for further proceedings consistent with the opinion herein.

All concurring.

---

12. *See supra* note 8.