STATE of Maine

v.

Hartley ARMEN.

Supreme Judicial Court of Maine.

Argued Sept. 3, 1987.
Decided Feb. 23, 1988.

John D. McElwee (orally), Dist. Atty., Caribou, for plaintiff.

Hartley Armen, pro se (orally).

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

ROBERTS, Justice.

Hartley S. Armen appeals from a judgment of the Superior Court, Aroostook County, affirming his conviction by the District Court, Presque Isle, of criminal trespass, 17–A.M.R.S.A. § 402(1)(D) (1983).[1] Armen contends that the order given him on July 7, 1986, to leave the district office of U.S. Representative Olympia Snowe violated his constitutional rights and was not justified. We affirm Armen's conviction.

### FACTS

Armen had been designated by the Maine Coalition for Peace and Justice in Central America to seek an appointment with Rep. Snowe. He had visited the district office prior to July 7, 1986, "quite a few times" seeking information on public issues, communicating his views on those issues to the office manager and, most significantly, seeking a meeting with Rep. Snowe. On at least one prior occasion he had been arrested at the district office by members of the Presque Isle Police Department. Armen had been unsuccessful in obtaining any commitment from Rep. Snowe for an eventual meeting, either with him or with others in the state who shared his political views. In fact, he had received no answer to his last written request dated May 14, 1986. By his own admission, Armen went to the district office on July 7 feeling "disturbed ... about the fact that she had not met anyone" and "feeling very stubborn about it."

At trial Armen denied that he went to the district office to get arrested or for the purpose of "sitting-in." He did, however, anticipate that the police might be called again. For that reason he went to the police department prior to going to the district office. He testified that he "felt that there was apt to be a problem" and he "wanted the police to be forewarned."

When Armen arrived at the district office on July 7, 1986, another constituent was present in the office. He voluntarily withdrew so that the individual could complete his business. Eventually Armen advised the office manager, Marion Higgins, that he still wanted a meeting with Rep. Snowe and that he had received no answer to his last request. Higgins replied that the Bangor office would have told him that Rep. Snowe could not meet with him. After further discussion Higgins asked Armen whether he intended to sit-in at the office if no meeting was arranged. He replied that he would be very reluctant to leave without progress toward arranging a meeting and that, if necessary, he would sit-in or remain in the office. When Higgins asked if he meant then, on that day, Armen replied that if necessary he would sit-in on that day. Higgins advised Armen that she could not allow him to stay in the office indefinitely and he repeated his re-

1. Section 402(1)(D) provides:
   1. A person is guilty of criminal trespass if, knowing that he is not licensed or privileged to do so:
   . . . . .

   D. He remains in any place in defiance of a lawful order to leave, which was personally communicated to him by the owner or other authorized person. . . .

luctance to leave without some indication of a meeting in the future.

Higgins arranged for Armen to talk with Rep. Snowe's administrative assistant in Washington, D.C. That conversation, however, did not resolve the matter in a manner satisfactory to Armen. After further discussion with Higgins established that an eventual meeting was unlikely, Higgins asked Armen to leave. Armen refused. Higgins told Armen that she would have to call the police and have him arrested. Armen stated that he did not want to be arrested, but that was the only way he would leave. Higgins testified that she did not feel threatened and that Armen was not belligerent or abusive. She advised Armen, however, that she felt that his remaining in the office prevented her from doing her job. Although Armen argues on appeal that he then had further business to conduct at the district office, he admits that he never conveyed his intentions to Higgins.

Two police officers, one in uniform, responded to a call from the district office. Armen told the officers that Higgins had asked him to leave and that he refused. The officers asked him to leave and Armen again refused. The officers then arrested Armen.

## DISCUSSION

"When, as here, a defendant challenges the sufficiency of the evidence, we will set the conviction aside only if no trier of fact rationally could have found the elements of the crime beyond a reasonable doubt." *State v. Brewer*, 505 A.2d 774, 775 (Me. 1985). A concomitant principle requires that we view the evidence in the light most favorable to the State. *State v. Barry*, 495 A.2d 825, 826 (Me.1985). The District Court's factual determinations are afforded such deference even when those determinations involve issues of constitutional dimension. *State v. Durepo*, 472 A.2d 919, 921 (Me.1984). Although the determination of the lawful nature of Higgins' order to Armen to leave the district office may have involved narrow factual distinctions, we cannot say on the evidence presented that no trier of fact rationally could have found that element of the crime beyond a reasonable doubt.

Armen contends that the order to leave and his subsequent arrest violated his constitutional rights to petition and free speech. U.S. Const. amend. I and Me. Const. art. I, §§ 4, 15. Although the State can place reasonable time, place and manner restrictions on the exercise of first amendment rights,[2] content-based regulations presumptively violate the first amendment. *See Ass'n of Ind. Professionals v. MLRB, et al.*, 465 A.2d 401, 409 (Me.1983). In this instance, Armen's claim of constitutional violation fails. First, there is no evidence in the record that Higgins asked Armen to leave or that the police arrested Armen because of the content of his message. Presumably the police would arrest anyone who failed to respond to Higgins' request and attempted to remain in the office as did Armen. The District Court rationally could have found beyond a reasonable doubt that Armen was ordered to leave and finally arrested because his presence interfered with the operation of the office, not because he conveyed a particular political message. Second, on the basis of Armen's own testimony, the District Court could have found beyond a reasonable doubt that Armen had concluded his business with the field representative *before* being asked to leave. Thus, any "restriction" came *after* Armen had exercised his rights.

Armen also contends that the order to leave the district office was unlawful because it was unjustified. An order to leave property open to the public is lawful only when an authorized person "has some justification for requesting removal." *State v. Tauvar*, 461 A.2d 1065, 1067 (Me.1983). Because his actions were peaceful, Armen contends there was no justification for his

---

**2.** *See Wayte v. United States*, 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 1532 n. 11, 84 L.Ed.2d 547 (1985) (where petitioner did not argue that there was a different burden placed on his rights to petition and free speech, the claims were treated as "essentially the same." The two rights are separate, but "related and generally subject to the same constitutional analysis.")

removal. *Cf. Snead v. Commonwealth,* 212 Va. 803, 188 S.E.2d 197 (1972) (The court found no *common law* criminal trespass where defendant's entry was lawful and his conduct did not threaten a breach of the peace). In *Tauvar,* however, we did not incorporate into section 402(1)(D) the common law doctrine of *Snead.* Rather, we determined that the Legislature intended by the use of the word "lawful" in section 402(1)(D) to require "some justification" for removal of a person from premises to which the public is invited or within which the public must be served. We held that Tauvar's prior misconduct was sufficient justification for the order to leave despite the absence of evidence of a present threat to the peace. *Tauvar,* 461 A.2d at 1067.

■ Higgins testified that the district office is maintained for the purpose of handling constituent concerns. Members of the public are invited to enter to express their concerns and obtain information on legislation. Because of the public invitation, Armen's initial entry was not a trespass. Upon completion of his legitimate business, Armen was not privileged to remain. Armen argues, nevertheless, that Higgins arbitrarily ordered him to leave before he had the opportunity to complete his business. The record indicates and Armen concedes that he had not informed Higgins that he had additional matters to discuss. Because the evidence viewed in the light most favorable to the State supports a finding that Armen had completed his business and that his continued presence interfered with the operation of the district office, we conclude that the District Court was not compelled to entertain a

reasonable doubt as to the lawfulness of Higgins' order.

The entry is:

Judgment affirmed.

McKusick, C.J., and Nichols, Wathen, Glassman and Clifford, JJ., concurring.

SCOLNIK, Justice, dissenting.

I respectfully dissent.

I conclude that Armen was peaceably engaging in a constitutionally protected form of political expression when he refused to obey an order to leave his congressional representative's field office, and therefore a criminal trespass conviction predicated on such refusal cannot stand.

At the time of the incident in question, Armen was a farmer in Linneus who was involved with the Maine Coalition for Peace and Justice in Central America (hereinafter "the Coalition"). For several months prior to July 7, 1986, Armen had been trying to arrange a meeting with Rep. Snowe on behalf of a number of organizations such as the Coalition. The Coalition and other groups wished to discuss the issue of funding for the Nicaraguan Contras. Despite Armen's efforts, no meeting had been arranged. Armen had visited the Presque Isle office of Rep. Snowe on several occasions during the preceding year to renew his request for a meeting with her.

On May 14, 1986, Armen mailed a request for a meeting to Rep. Snowe on behalf of the Coalition. He received no response. On July 7, 1986, Armen went to Rep. Snowe's Presque Isle office to follow up on his May 14 letter and pursue his earlier requests for a meeting.[1]

---

1. The court notes that Armen contacted the Presque Isle police department prior to his visit on July 7. However, the court does not fully describe Armen's purpose in notifying the police on his plans to visit Rep. Snowe's office. Armen testified at trial that he did not intend to be arrested. However, based on his prior experiences with the Presque Isle police, Armen felt it would be prudent to forewarn them of his visit to Rep. Snowe's office, so that the police would know, in Armen's words, "if [they] got a call, it was just [Armen] and not some rowdy." Armen might well have felt there was "apt to be trouble," but the record indicates he did not go to the office to seek a confrontation; his intent was to arrange for a meeting. It should be borne in mind that it was common for civil rights protesters in the South to forewarn local police departments of possible sit-ins and demonstrations. *See Brown v. Louisiana,* 383 U.S. 131, 137, 86 S.Ct. 719, 721, 15 L.Ed.2d 637 (1966). Warning the local police in this manner is not the behavior of a common ruffian intent on causing a disturbance; on the contrary, this approach shows a constructive concern for ensuring the civil, non-violent expression of a political belief.

When Armen entered Rep. Snowe's office, another constituent was in the office with the office manager, Marion Higgins. Armen asked Higgins if she wanted him to leave and not return until after the other constituent had departed. Higgins indicated she would like Armen to do so and he immediately complied with her request. The other constituent finished speaking with Higgins and left; Armen returned shortly thereafter.

Armen entered the office and talked with Higgins about his pending request for a meeting with Rep. Snowe. After a brief discussion, Higgins phoned an Administrative Assistant in Rep. Snowe's Washington office and permitted Armen to speak with him. They conversed for several minutes. The assistant had indicated to Armen it would not be possible to arrange an appointment with Rep. Snowe. At that point Armen had been in the office for 35 to 45 minutes. Higgins then asked Armen to leave, or she would call the police. Armen refused to leave. The police were called and he was arrested for criminal trespass.

As a constituent, Armen entered Rep. Snowe's office to make known his views regarding an important issue of the times. The court's opinion acknowledges that Armen's initial entry to express his concerns as a constituent was lawful. The court predicates its affirmance of the criminal trespass conviction, however, on the mistaken conclusion that at the time he was ordered to leave, Armen had completed his business and there was no longer any legitimate purpose to his visit; therefore, his continued presence interfered with the operation of the office. In this view of the circumstances, the court concludes the District Court could rationally have found that the order to leave was lawful since it was based upon "some justification." *See State v. Tauvar*, 461 A.2d 1065, 1067 (Me. 1983). Because Armen's exercise of his right of free speech was a persisting legitimate purpose of his visit to the district office, the court's premise that he had completed his business is critically flawed.

The court summarily dismisses Armen's claim that he was exercising his rights to free speech and to petition under our State and Federal constitutions. The court states "... [O]n the basis of Armen's own testimony, the District Court could have found beyond a reasonable doubt that Armen had concluded his business with the field representative [Higgins] *before* being asked to leave. Thus, any 'restriction' came *after* Armen had exercised his rights." At 1145. Further on in its opinion, the court states, "Upon completion of his legitimate business, Armen was not privileged to remain [in the field office]." At 1146. It is undeniable that Armen intended to "sit-in" in the waiting area of the field office to demonstrate his disapproval both of Rep. Snowe's refusal to meet with him and, by clear implication, her position regarding governmental policy in Central America. The court concedes that Armen clearly expressed to Higgins his intent to conduct a sit-in if he was not allowed to arrange for a meeting with Rep. Snowe. According to Armen's own testimony, upon which the court relies, he told Higgins that he would "be very reluctant to leave without some sort of an agreement to a meeting and that, if necessary, yes, I would sit-in or remain in the office, if that was what it took to get a meeting."

For at least two decades, peaceful demonstrations in the form of sit-ins have been a constitutionally acceptable form of civil protest. *See, e.g. Taylor v. Louisiana*, 370 U.S. 154, 82 S.Ct. 1188, 8 L.Ed.2d 395 (1962) (sit-in by black protesters at segregated bus terminal); *Garner v. Louisiana*, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961) (sit-ins by black students at segregated lunch counters). The rights to free speech and petition are "not confined to verbal expression" and "certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence." *Brown v. Louisiana*, 383 U.S. 131, 142, 86 S.Ct. 719, 724 (1966) (Fortas, J. joined by Warren, C.J. and Douglas, J., plurality) (referring to sit-in by black students at segregated public library). Likewise, this court has clearly stated that "Certain nonverbal conduct is capable of categorization as expression which may be constitutional-

ly protected." *State v. Drake*, 325 A.2d 52, 55 (Me.1974).

The court's suggestion that the evidence supports a rational finding by the District Court that Armen was not engaging in a cognizable form of speech when he quietly remained in the office is unfounded. A protester's non-verbal communication in a context in which the message is understood by those present constitutes protected speech within the ambit of the First Amendment. *See Spence v. State of Washington*, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730–31, 41 L.Ed.2d 842 (1974); *Drake*, 325 A.2d at 55. Contrary to the court's position, no rational factual basis exists for the District Court's finding that Armen had "concluded his business" after he was finished speaking on the phone. In fact, the phone conversation had only confirmed Rep. Snowe's persistent refusal to meet with Armen or anyone from the Coalition. By staying in the office, he remained present for the purpose of engaging in First Amendment conduct in protest of this refusal and, by implication, in demonstration of his opposition to Rep. Snowe's views on the Contra question. Armen had by no means completed his "legitimate business" prior to Higgins's order to leave. In the context of this case, his silent presence conveyed a message clearly understood by Higgins and her colleagues, and his actions constituted protected speech under our State and Federal Constitutions. Moreover, by expressing his concerns as a constituent, Armen was acting well within the purposes of the field office.

No justification exists in these circumstances for imposing restrictions on Armen's exercise of his free speech rights. Even if Armen's arrest did *not* amount to a content-based restriction, as the court concludes, the trespass conviction should not stand. The government is allowed to make reasonable time, place and manner restrictions on speech, but *only* where those restrictions serve significant governmental interests. *See Grayned v. City of Rockford*, 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–03, 33 L.Ed.2d 222 (1972); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 509, 89 S.Ct.

733, 737, 21 L.Ed.2d 731 (1969); *Konigsberg v. State Bar of California*, 366 U.S. 36, 50–51, 81 S.Ct. 997, 1006–1007, 6 L.Ed. 2d 105 (1961). Under this analysis, Armen's conviction should not be upheld for two reasons. First, neither an arbitrary order to leave nor an arrest constitute reasonable restrictions on speech in these circumstances. Second, there is no evidence in the record of *any* governmental interest, significant or trivial, that was served by Armen's arrest. Although Higgins claimed that Armen's presence had the *potential* to disrupt the office, the record is bereft of any evidence to support her assertion.

Accordingly, because Armen was exercising his rights under the First Amendment of the United States Constitution and Article I section 15 of the Maine Constitution by remaining peaceably and unobstructively in the district office, it ineluctably follows that his legitimate business persisted, he was privileged to remain, and the order to leave cannot be characterized as a lawful one.

Without "some justification" to support Higgins's order to leave, Armen's refusal to obey the order cannot form the basis for a criminal trespass conviction. *Tauvar*, 461 A.2d at 1067. The only evidence the court is able to cite in support of its conclusion that the District Court could have rationally found that Higgins's order to leave was justified is that Higgins "felt" his presence in Rep. Snowe's office was an interference with the operation of the office. Aside from Higgins's "feelings," there is insufficient evidence in the record before us to indicate that Armen was interfering with the functioning of the office. A mere unelaborated assertion of a feeling or fear that one single protester's presence will cause a disturbance is insufficient justification for an order to leave. *Cf. Garner*, 368 U.S. at 171–72, 82 S.Ct. at 255–56 (restaurant owner's unsubstantiated fear could not justify the arrest of black students quietly sitting at a segregated lunch counter).

The record before us plainly shows that Armen conducted himself in an orderly and civil manner while he was at the office.

When Higgins was engaged in conversation with another constituent, Armen volunteered to return at a later time of day and he, in fact, did so. Higgins conceded during the trial that Armen was not threatening, abusive or belligerent during his visit. In these circumstances, where Armen was exercising his constitutional right to free speech in a peaceful and nondisruptive way, an order to leave cannot be deemed to be justified and thus lawful for the purposes of the criminal trespass statute. *See Tauvar*, 461 A.2d at 1067.

I am disturbed by the precedent that will be created by affirming a criminal trespass conviction of a citizen peaceably exercising his rights of free speech in a public place. *Compare State v. Chiapetta*, 513 A.2d 831 (Me.1986) (affirming disorderly conduct conviction of verbally abusive defendant in voting area) and *State v. Gordon*, 437 A.2d 855 (Me.1981) (affirming conviction of defendant who was talking loudly, swearing and creating a disturbance in a donut shop). I am concerned that public officials will now find approval for the arbitrary removal of a non-disruptive but persistently questioning citizen from a public office.

This record raises the question whether Armen was arrested and forcibly removed from Rep. Snowe's field office because he was asking too many questions concerning a controversial issue, and expressed his displeasure both with his congressional representative's refusal to meet with him and with her political position regarding that issue. Despite his undisturbing manner of conduct, Armen was considered a nuisance and was ordered to leave. Elected representatives and their employees in the field must expect and tolerate dissident expression. The right to communicate one's views to elected public officials is an essential part of our representative political system. This court should not affirm the criminal conviction of a citizen exercising this right.

In conclusion, on the evidence in this case, the District Court judge was compelled to entertain a reasonable doubt as to the lawfulness of Higgins's order to leave. Accordingly, I would vacate the judgment and remand to the Superior Court with instructions to remand to the District Court for the entry of judgment of acquittal.