**CITY OF PORTLAND**

v.

**Anthony J. JACOBSKY et al.**

Supreme Judicial Court of Maine.

Argued Sept. 14, 1984.

Decided Aug. 6, 1985.

are operators of adult bookstores, so-called, and variety stores.

When the Plaintiff City appealed from the District Court's determination that the enactment of this ordinance was flawed, the several Defendants cross-appealed, asserting that the ordinance was unconstitutional. At that point the 14 cases were consolidated. The Superior Court (Cumberland County) concluded that the ordinance, proposed by initiative, had been properly enacted by the City and was consistent with state statutes. The Court declared, however, that the ordinance was invalid because it infringed upon the freedom of expression guaranteed these Defendants by the Declaration of Rights of the Constitution of Maine. The Court further suggested that the ordinance may be so impermissibly vague that it fails to satisfy the due process requirement of Maine's Constitution.

Mittel & Hefferan, Robert Edmond Mittel, (orally), Charles A. Lane, Portland, for plaintiff.

Longley, Whalen & Burke, E. James Burke, (orally), Lewiston, for DePaolo and Graten.

Bernstein, Shur, Sawyer & Nelson, John M.R. Paterson, (orally), Jeffrey T. Shedd, Portland, for Jacobsky, Stilphen, Discatio, Ratliff, McCarthy & Brown.

Daniel G. Lilley, E. Paul Eggert, Portland, for Campbell & Palmer.

Jeffco, May & Smart, Stephen Jeffco, Portsmouth, N.H., for Roy and Rossetti.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

NICHOLS, Justice.

This appeal, testing the constitutionality of the obscenity ordinance enacted in 1982 by the Plaintiff, City of Portland, arises out of 14 Rule 80H proceedings commenced in 1983 in District Court (Portland) to collect civil penalties for violations of this ordinance from the respective Defendants, who

The Plaintiff City appealed that judgment and the several Defendants cross-appeal.

We sustain the City of Portland's appeal and we deny the cross-appeal.

■ At the threshold we have studied the Defendants' arguments that the Plaintiff City was deficient in complying with the steps required of it in adopting this ordinance. As did the Superior Court upon its review, we conclude that the procedures followed by the City were not seriously flawed. The Defendants take nothing by these arguments.

■ We further conclude that appropriate procedures are available to the Plaintiff City for adjudicating violations of the ordinance. Rule 80H, M.D.C.Civ.R., authorizes the District Court to handle civil violations such as those alleged by the Plaintiff against the Defendants. The fines that may be imposed for violations of the Portland ordinance do not alone compel a finding that an action brought pursuant to the ordinance is criminal in nature so as to require procedural safeguards not provided in Rule 80H. *See United States v. Ward,*

448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980). Nor is the thrust criminal because the ordinance requires proof of scienter. Upon considering the other factors employed by this Court in *State v. Anton*, 463 A.2d 703 (Me.1983) and by the United States Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) to discern whether the ordinance is criminal in nature, we conclude that violations of this ordinance are civil in nature.

We move on, then, to the Defendants' two-pronged constitutional challenge. They assert that this obscenity ordinance (a) is so overbroad that it infringes upon their constitutionally guaranteed freedom of expression and (b) is cast in language that is so vague that prosecution of them under the ordinance would result in a denial of their constitutionally protected right to due process.[1]

■ Just as we avoid expressing opinions on constitutional questions when the issue before us on appeal may be otherwise resolved, a similar policy of judicial restraint impels us to forbear from ruling on federal constitutional questions when the provisions of our state constitution may settle the matter. *State v. Larrivee*, 479 A.2d 347, 349 (Me.1984); *State v. Rowe*, 480 A.2d 778, 781 (Me.1984); *State v. Cadman*, 476 A.2d 1148, 1150 (Me.1984). This primacy rule was correctly followed by the Superior Court.

■ In language unchanged since Maine achieved statehood the Declaration of Rights of our Constitution proclaims in pertinent part:

Every citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty.

Me. Const. art. I, § 4.[2] The impact of this provision on the publication of obscene materials has heretofore never been analyzed by this Court. On the other hand, the United States Supreme Court and other federal courts have had many occasions to determine the application of the First Amendment to such publications. We note the care with which the drafters of the Portland ordinance have followed the conjunctive three-element test that the United States Supreme Court set forth in *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973), to delineate the scope of obscene expression *not* protected by the constitutional safeguards of the First Amendment. By tracking the *Miller* definition of obscenity, the Portland ordinance passes muster under the federal constitution. Any difference in language between the Maine Constitution and the United States Constitution is, in the context of this case, insufficient to justify striking out

---

**1.** The Defendants focus their attack upon the definition that is set forth in Section 1 of this ordinance:

"Obscene" means material or a performance that:

(A) the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

(B) depicts or describes:

(i) patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

(ii) patently offensive representations or descriptions of masturbations, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; and . . .

(C) taken as a whole, lacks serious literary, artistic, political or scientific value.

**2.** The federal counterpart is found within the First Amendment to the United States Constitution:

Congress shall make no law . . . abridging the freedom of speech, or of the press; . . . .

Not only is the federal provision cast in language that restricts the legislative power, but this safeguard was not declared by the United States Supreme Court to be applicable to the states through the Fourteenth Amendment until a comparatively recent period. *See, e.g., Fiske v. Kansas*, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927). *See generally* L. Tribe, *American Constitutional Law* § 11–2 (1978).

on our own to develop a unique answer to the difficult definitional problem that has been long and often litigated under the First Amendment. We refuse to extend state constitutional protection to obscene expression that under the *Miller* test does not enjoy federal constitutional protection. Accordingly, we conclude that the Portland ordinance does not infringe upon the Defendants' freedom of expression guaranteed by Article I, Section 4, of our Maine Constitution.

In *Inhabitants of the Town of Kittery v. Campbell,* 455 A.2d 30, 33 (Me.1983) we acknowledged that the definition set forth in *Miller* was a "significant factor" in our consideration of that challenge to an ordinance grounded in freedom of expression. That definition remains significant today.[3] Indeed, the continued vitality of *Miller v. California, supra,* was evidenced recently when the United States Supreme Court upheld the constitutionality of a Washington statute drafted in terms of the conjunctive three-element test of *Miller v. California. Brockett v. Spokane Arcades,* — U.S. ——, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).

It is unnecessary for us to declare, and we intimate no opinion whatsoever, whether in every case that may arise this provision of Article I, Section 4, and its federal counterpart will be found coextensive. Because we conclude that the Portland obscenity ordinance does not proscribe expression which is protected by Article I, Section 4, or its federal analogue, no valid argument can be made that the ordinance is overbroad.[4]

■ An ordinance or a statute is overbroad when its language not only forbids conduct constitutionally subject to proscription but is so broad that it ensnares protected conduct as well. *Wright v. Town of Huxley,* 249 N.W.2d 672, 678 (Iowa 1977); *United States v. Dellinger,* 472 F.2d 340, 357–359 (7th Cir.1973).[5]

■ Nor do we agree with the suggestion of the Superior Court that the Portland obscenity ordinance may be void for vagueness.[6] An ordinance or a statute may be void for vagueness when its language either forbids or requires the doing of an act in terms so vague that people of common intelligence must guess at its meaning. As we reiterated in *Maine Real Estate Commission v. Kelby,* 360 A.2d 528, 529 (Me. 1976), due process requires that the law provide reasonable and intelligible standards to guide the future conduct of our people. We conclude that that infirmity is not found in the Portland obscenity ordinance. Indeed, it is difficult to see how an ordinance that so precisely follows the *Miller* definition of proscribable obscenity could be unconstitutionally vague.

In the context of this case we do not interpret the Maine Constitution to produce a result different from that which would be reached under the federal constitution.

3. *See generally* Comment, *An Empirical Inquiry into the Effects of Miller v. California on the Control of Obscenity,* 52 N.Y.U.L.Rev. 810, 820–857 (1977).

4. The suggestion invokes Article I, Section 6–A, of the Maine Constitution, and implicates as well the Due Process Clause of the federal constitution. For a seminal article on overbreadth *see* Bernard, *Avoidance of Constitutional Issues in the United States Supreme Court: Liberties of the First Amendment,* 50 Mich.L.Rev. 261, 271–86 (1951).

5. *See also Association of Community Organizations for Reform Now (ACORN) v. Municipality of Golden,* 744 F.2d 739 (10th Cir.1984); *Bangor Baptist Church v. State of Me. Dep't. of Educ. and Cult. Services,* 549 F.Supp. 1208 (D.C.Me. 1982); Note, *The First Amendment Overbreadth* 83 Harv.L.Rev. 844 (1970).

6. On vagueness *see Commonwealth v. Williams,* 395 Mass. 302, 479 N.E.2d 687 (1985); *see also* Note, *The Lawson Decision: A Broadening of the Vagueness Doctrine,* 13 Stetson L.Rev. 412, 422–430 (1984).

On the issues raised herein our mandate must be:

Judgment vacated.

Remanded to the Superior Court to be remanded to the District Court for further proceedings consistent with the opinion herein.

McKUSICK, C.J., and VIOLETTE and WATHEN, JJ., concurring.

SCOLNIK, J., with whom GLASSMAN, J., joins, concurring in part and dissenting in part.

I concur with the Court's holding on the non-constitutional issues in this appeal. The Portland Ordinance is neither expressly nor implicitly preempted by State legislation. 30 M.R.S.A. § 1917 (1978). The enactment procedure complied with the clear purposes of the Portland Municipal Code. *Crosby v. Inhabitants of the Town of Ogunquit,* 468 A.2d 996, 998 (Me.1983). The procedure for adjudicating, and the punishment for committing, a civil violation under the ordinance do not place it in a larger criminal statutory scheme so that those charged under it would require constitutional criminal safeguards. *State v. Freeman,* 487 A.2d 1175 (Me.1985). However, I respectfully dissent from the Court's holding that this Ordinance does not, on its face, violate the free speech guarantee of Article I, Section 4 of the Maine Constitution.

I.

The Portland Obscenity Ordinance is a complete governmental ban on the dissemination and receipt of some sexually explicit expression, based solely on the potential of the expression to offend the average member of the community. It is my opinion that expression which is merely offensive, but which itself causes no harm of a type that the State has a compelling interest in regulating, is protected from outright censorship by Article I, Section 4. Because the Portland Ordinance[1] completely prohibits some sexually explicit expression irrespective of its potential for harm, I would affirm the Superior Court's judgment holding it unconstitutionally overbroad.

I agree with the majority that the Ordinance should be tested first under Article I, Section 4. *State v. Flick,* 495 A.2d 339, 343 (1985); *State v. Rowe,* 480 A.2d 778, 781 (Me.1984). Since, in my view, the Maine Constitution provides a definitive answer, it is unnecessary to express an opinion on whether the Ordinance meets federal constitutional standards.[2]

The Superior Court held, in relevant part, that the scope of the Ordinance was broad enough to prohibit communications protected by Article I, Section 4 of the Maine Constitution. The Court assumed that the defense of "overbreadth" was available to these defendants to challenge the statute under that section, whether or not some material seized from them might be banned under a narrower regulation.[3] Despite its reliance on Article I, Section 4 for the sub-

---

1. The complete text of the Ordinance is appended to this opinion.

2. The Superior Court noted that sections 2(e) and (f) of the Ordinance, creating certain presumptions of mental state, might not meet federal constitutional standards. *Cf. Red Bluff Drive-In, Inc. v. Vance,* 648 F.2d 1020, 1030–1032 (5th Cir.1981), *cert. den.,* 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982). In my view, the majority opinion is unduly perfunctory in equating the State and federal constitutional protections without addressing this question.

3. The "overbreadth" defense is that "the statute's language, which has been applied to the defendant, is so broadly phrased [even though not necessarily also vague] that it is by a reasonable construction capable of application to other conduct, which cannot constitutionally be proscribed." Bernard, *Avoidance of Constitutional Issues in the United States Supreme Court: Liberties of the First Amendment,* 50 Mich.L.Rev. 261, 272 (1951). It is thus an exception to the rule that "[o]ne who attacks the constitutionality of a legislative act must be actually deprived of a constitutional right by that legislation." *Brann v. State,* 424 A.2d 699, 702 (Me.1981).

stantive decision, the Superior Court here relied on First Amendment jurisprudence, citing *Village of Schaumburg v. Citizens For a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), and *Equifax Services Inc. v. Cohen*, 420 A.2d 189, 196 (Me.1980).

We have never had occasion to consider whether a party may assert the defense of a statute's overbreadth under Article I, Section 4 of the Maine Constitution. The doctrine "derives from the recognition that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review...." *Equifax Services, Inc. v. Cohen*, 420 A.2d at 196; *Inhabitants of Town of Kittery v. Campbell*, 455 A.2d 30, 32 (Me.1983). That "judicial prediction or assumption," *id.*, is no less valid in the case of Article I, Section 4. The courts of other states that have considered the question have held that litigants may assert the rights of others under their respective constitutional guarantees of free speech "in a manner similar to that in which overbreadth arguments have been advanced under the First Amendment." *Aristocratic Restaurant of Mass., Inc. v. Alcoholic Beverage Control Commission*, 374 Mass. 547, 374 N.E.2d 1181, 1187 (1978). *See State v. Spencer*, 289 Or. 225, 611 P.2d 1147 (1980). There is no reason not to hold that the doctrine of overbreadth is also applicable to litigation under Article I, Section 4 of the Maine Constitution. There is thus nothing to preclude us from considering whether the Ordinance is invalid on its face, as the Superior Court decided.

## II.

Section 4 of Article I of the Maine Constitution provides, in part, "[e]very citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty." [4] This is affirmative language that emphasizes the commitment of our State to the protection of its citizens "against governmental encroachment on their freedom of speech." *State v. John W.*, 418 A.2d 1097, 1101 (Me.1980). Expressly grounding our opinion on Article I, Section 4, *id.* at 1106, we said there that, "[o]ur fundamental interest in free speech 'demands the existence of a compelling governmental interest to justify legislative restrictions upon it.'" *Id.* at 1101. *State v. John W.* reversed a disorderly conduct conviction based solely on the defendant's words because we found no such compelling interest in the context in which the speech was uttered.

We observed, in dictum, that the United States Supreme Court has found a "compelling governmental interest" to justify regulating "obscenity." *Id.* That statement was made for purposes of analogy, and was not strictly correct. The Supreme Court has, instead, held that legally "obscene" material is completely *outside* the protection of the First Amendment to the federal constitution. *E.g., Miller v. California*, 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973); *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957). Because material meeting the *Miller* definition of "obscene" [5] is unprotected, a statute prohibit-

---

**4.** Art. I, § 4 provides in full:
Every citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty; no laws shall be passed regulating or restraining the freedom of the press; and in prosecutions for any publication respecting the official conduct of men in public capacity, or the qualifications of those who are candidates for the suffrages of the people, or where the matter published is proper for public information, the truth thereof may be given in evidence, and in all indictments for libels, the jury, after having received the direction of the court, shall have a right to determine, at their discretion, the law and the fact.

**5.** 413 U.S. at 24, 93 S.Ct. at 2615:
The basic guidelines ... must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest ... (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

ing its dissemination does not violate the First Amendment even where it is not aimed at protecting any "compelling" interest. The State need show no more than the "legitimate" police power interest that it requires to regulate in other constitutionally-unprotected areas, even when the censorship is strictly on the basis of content. *Paris Adult Theater I v. Slaton*, 413 U.S. 49, 57–63, 93 S.Ct. 2628, 2635–38, 37 L.Ed.2d 446 (1973). Under the First Amendment a court need not strictly scrutinize content-based censorship of "obscene" expression, but will defer to asserted State regulatory interests based on no more than "arguable correlation[s]," "empirical uncertainties," "unprovable assumptions," "imponderables," and conclusions for which "there is no conclusive or empirical data." *Id. See also Kaplan v. California*, 413 U.S. 115, 120, 93 S.Ct. 2680, 2684, 37 L.Ed.2d 492 (1973).[6]

The Supreme Court has excluded "obscenity" from federal constitutional protection by adopting an interpretation of the First Amendment that limits "speech," as used there, to the "exposition of ideas." *Roth v. United States*, 354 U.S. at 484–85, 77 S.Ct. at 1309. Moreover, when speech is sexually explicit and "patently offensive," the ideas it conveys must have "serious literary, artistic, political, or scientific value," or they are wholly outside the First Amendment. *Miller v. California*, 413 U.S. at 24, 93 S.Ct. at 2615. This approach stems from the "categorical" one originally adopted by the Court to exclude "fighting words" from protection. *See Chaplinsky*

*v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). In dictum, the *Chaplinsky* Court observed that "the lewd and the obscene ... are no essential part of any exposition of ideas, and are of ... slight social value as a step to truth...." *Id.* Implicitly holding thereby that the purpose of the First Amendment is limited to fostering the search for "truth," the Court has deemed "obscenity" irrelevant to that search, and thus entirely unprotected.[7]

By removing all constitutional protection from this "category" of expression, the Supreme Court has reduced the legal issue over its regulation to one of mere definition.[8] However, the substance of this definition is aesthetic and moralistic, without any reference to substantive harm. *See, e.g.*, the various dictionary definitions of "obscene" quoted by the Court in *Miller*, 413 U.S. at 18, n. 2, 93 S.Ct. at 2612, n. 2. Because material thought to meet this definition is entirely unprotected by the First Amendment, the State may set aesthetic and moral standards that its citizens must follow, even behind closed doors.

The superficial simplicity of reducing the legal issue to one of definition obscures the essential complexity of its application. It has, in my view, undesirably shifted the burden of determining acceptable standards of expression from the legislature to juries and thence to appellate courts. Under the *Miller* regime, the prosecution need introduce no standard by which a court or jury is to judge the "obscenity" of material.

---

6. For the same reason, the Court has refuted the argument that the First Amendment requires the State to show a "clear and present danger" or a probability that "obscenity" will incite criminal acts. *Roth v. United States*, 354 U.S. at 486–87, 77 S.Ct. at 1310; *Ginsberg v. New York*, 390 U.S. 629, 641, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968) ("obscenity is not protected expression and may be suppressed without a showing of the circumstances which lie behind the phrase 'clear and present danger' in its application to protected speech").

7. This approach has had ironic results. Under the "pandering" doctrine, the circumstances of the dissemination of material may be con-

sidered in making the "obscenity" judgment. *Splawn v. California*, 431 U.S. 595, 97 S.Ct. 1987, 52 L.Ed.2d 606 (1977); *Ginzburg v. United States*, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). That is to say, material not "obscene" in and of itself may be deemed so if the purveyor emphasizes its "sexually provocative aspects." *Id.* at 470, 86 S.Ct. at 947. Yet, as Justice Stevens's dissenting opinion in *Splawn* recognized, the defendant was convicted for advertising truthfully about his products. 431 U.S. at 602–04, 97 S.Ct. at 1991–92.

8. *See* footnote 4.

*See, e.g., Paris Adult Theater I,* 413 U.S. at 56, 93 S.Ct. at 2634 ("The films, obviously, are the best evidence of what they represent"). Since a *Miller* determination that a work is "obscene" is ultimately not a finding of fact, but a judgment of law, each and every case will be considered anew on the evidence by at least one appellate court. *See, e.g., Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (reversing a jury finding that the film "Carnal Knowledge" was "obscene"). In *Jenkins,* Justice Brennan, concurring, observed, "there can be no doubt that *Miller* requires appellate courts—including this Court—to review independently the constitutional fact of obscenity." *Id.* at 163, 94 S.Ct. at 2756. Thus, not only does the First Amendment approach to (or, more accurately, retreat from) obscenity permit outright censorship without close scrutiny of the governmental interests involved, it also creates serious problems of disparate results and misallocation of judicial resources.

### III.

Though we have never examined the language of Article I, Section 4 of the Maine Constitution in this context, we have held that it is "no less restrictive" of government control than is the federal First Amendment. *State v. John W.,* 418 A.2d at 1101; *Opinion of the Justices,* 306 A.2d 18, 21 (Me.1973). Unlike the First Amendment ("Congress shall make no law ...

abridging the freedom of speech, or of the press ..."), Article I, Section 4 is an affirmative grant of liberty to the citizen: "[e]very citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty."

Looking first at the plain meaning of this clause, one finds that it has not been overlaid by judicial interpretation as has the federal First Amendment. On its face, Article I, Section 4 does not merely vouchsafe protection to the expression of ideas of value, but to "sentiments on any subject." The word "sentiments," comporting elements of emotion and feeling, may, by itself, be broader than "ideas."[9] More important, *no subject is unprotected.* The Maine Constitution extends at least the protection of constitutional-level scrutiny to the expression of sentiments on any subject, whether it be hostile and vulgar as in *State v. John W.,* or sexually explicit, as in the present case. None should be deemed wholly without protection and, by the plain language of Article I, Section 4, that protection only recedes so far as to permit holding the citizen "responsible for the abuse of this liberty."

An examination of the drafting history of Article I, Section 4 reveals nothing to indicate that any particular subject, or any treatment thereof, was intended to be wholly without protection. Section 4 was adopted by the Maine Constitutional Con-

---

**9.** When not faced directly with the question of the "value" of "obscenity," the Supreme Court has, in fact, acknowledged the First Amendment's concern with emotional expression. In *Stanley v. Georgia,* Justice Marshall equated "the right to read or observe what [one] pleases" with the "right to satisfy [one's] intellectual and emotional needs." 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969). The late Justice Harlan was more expansive.

[M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive

content of individual speech has little or no regard for that emotive function which practically speaking, may often be the more important element of the overall message sought to be communicated.

*Cohen v. California,* 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). The Court has also acknowledged that, "[t]he line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such a line can be drawn at all," *Stanley v. Georgia,* 394 U.S. at 566, 89 S.Ct. at 1249, and that, "[e]ntertainment, as well as political and ideological speech, is protected." *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981) (nude dancing).

vention of 1820 without any debate relevant to this question. *See Debates and Journal of the Constitutional Convention of the State of Maine (1819–1820)*, (Debates) at 115–117 and (Journal) at 45–46 (1894). The Convention's drafting committee had taken the Massachusetts Constitution as a basis, but, because that document had "in forty years experience proved inconvenient and defective in some few of its provisions," the Constitution that was adopted deviated from it "in those cases only, where the experience of this and other States in the Union seemed to justify and require it." *Address to the People of Maine, id.* (Journal) at 105–106. Since Article I, Section 4 represents a considerable expansion over the provision of Article XVI of the Massachusetts Declaration of Rights,[10] we may presume that it was one of those cases.

The City argues that "obscenity" was a statutory crime when Maine became a state in 1820. The Laws of Maine (1821) show only that "open gross lewdness and lascivious behavior" was then prohibited and say nothing of mere expression. Ch. X. Courts should not, in any event, base modern constitutional interpretation solely on the particular forms of the law as it existed in 1820. As the Oregon Supreme Court recently observed, "[c]onstitutional interpretation of broad clauses locks neither the powers of lawmakers nor the guarantees of civil liberties into their exact historic forms in the 18th and 19th centuries, as long as the extension remains true to the original principle." *State v. Robertson*, 293 Or. 402, 649 P.2d 569, 588 (Ore.1982). It has long been understood that constitutions evolve in our republican form of government, providing authority and guidance but not chains and fetters. Chief Justice Marshall made the point most succinctly when he said, "[w]e must never forget, that it is a *constitution* we are

expounding." *M'Culloch v. Maryland*, 4 Wheat. 316, 407, 4 L.Ed. 579 (1819).

## IV.

Because the plain language of Article I, Section 4 grants protection to expression on any subject, the crucial question is what constitutes an "abuse" for which a citizen may, nonetheless, be held responsible. Clearly, an abuse cannot be defined by the subject matter of the particular expression, since that would negate the affirmative language in the same provision: "may speak ... on any subject." On the other hand, a citizen may abuse this liberty no matter what his subject. The Law Court has called the responsibility under this clause a "broad and far-reaching limitation," that follows "Liberty in whatever paths she may desire to travel." *State v. Mockus*, 120 Me. 84, 93, 113 A. 39, 42 (1921). Whether or not there has been an abuse depends on the path traveled, that is, on the context and consequences of the chosen expression.

It is not a novel idea that an abuse of the liberty of speech relates to consequences and not solely to content. This is the approach that the First Amendment itself takes to expression that comes within its protection. We have held, for example, that a conviction for criminal threatening by speech, 17–A M.R.S.A. § 210, must be supported by a showing of the likely harmful consequences of the speech. *State v. Porter*, 384 A.2d 429 (Me.1978). This, we said, "restricts application of the statute to a kind of speech that produces or is likely to produce a clear and present danger of evils that Maine constitutionally may seek to prevent." *Id.* at 432.

Indeed, the Law Court has already adopted this approach in interpreting Article I, Section 4 of the Maine Constitution.[11]

---

**10.** Art. XVI then read: "[t]he liberty of the press is essential to the security of freedom in a state: It ought not therefore to be restrained in this Commonwealth."

**11.** Our first interpretation of Article I, Section 4 was in *State v. Mockus*, 120 Me. 84, 113 A. 39 (1921). There we found the blasphemy statute, R.S. ch. 126, § 30 (1916) (finally repealed by P.L.1975, ch. 499, § 5) to be constitutional.

We looked at vulgar, hostile speech in its contemporaneous context to reverse a conviction for disorderly conduct based solely on words in *State v. John W..* We held there that speech could not be punished as disorderly conduct under 17–A M.R.S.A. § 501(2) unless its consequences were of a nature that the State has a compelling interest in preventing. We recognized that the threatened harm need not actually result, but its imminence must be great enough to satisfy the "clear and present danger" test then most recently articulated in *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978). That test,

> requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed.

*State v. John W.,* 418 A.2d at 1102.

The use of this test implies, of course, that there is a constitutional inquiry to be made. If the analysis began with the presumption that the challenged speech was in an "unprotected category," no such balancing would be necessary. In fact, we rejected the categorical approach to "fighting words" in *John W. Id.* at 1104–06. We said, "language which is merely distasteful cannot be punished." *Id.* at 1102. We held that hostile language may only be proscribed when it presents a clear and present danger of harm that the State has a compelling interest in preventing. *Id.* Construing 17–A M.R.S.A. § 501(2) to apply only to such a situation, we found it constitutional on its face. We then reversed the conviction because the defendant's expression did not constitute a clear and present danger.

Narrowly read, that decision affirmed a conviction for disturbing the peace. It analyzed the speech in light of its purpose, its context, and what we then agreed to be its tendency to undermine compelling government interests. We

A reasonable construction of Article I, Section 4, reflecting our founding fathers' concern that we avoid the passions of intolerance from which so many of our ancestors fled, is that in Maine, people should be free to speak, write, and publish unless their expression creates a danger of harm to others that Maine constitutionally may seek to prevent. To regulate expression, more is required than simply banning the "obscene" and then basing enforcement decisions on standards set by the shifting sands of community moral and aesthetic tolerance.

### V.

The Ordinance under consideration here imposes an outright prohibition on the "promotion" or dissemination of material the content of which falls within the Ordinance's definition of "obscenity." Though the definition is based, in part, on a description of the effects the material may cause, those consequences need not stem from the prohibited activity of "promotion." Instead, they are the "average person's" hypothetical reaction to the content of the material *irrespective of context.* The Ordinance thus bans the material solely on the basis of its content.

We have said that, "any government restrictions on freedom of expression aimed at the content of communication presumptively violate the first amendment." *Association of Independent Professionals v. Maine Labor Relations Board,* 465 A.2d 401, 409 (Me.1983). To overcome that presumption, the State must show "that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* at 410. "This standard requires the most strict and rigid scrutiny" of the regulation. *Id.* My brethren in today's majority are surely unwilling to ascribe *less* protection to Article

have, however, overruled *Mockus* to the extent that it conflicts with our holding in *John W.,* 418 A.2d at 1102, n. 3, and I do not rely on it in the present opinion.

I, Section 4 than the First Amendment offers. Thus, the Court's only reason for failing strictly to scrutinize the Portland Ordinance is the same as the United States Supreme Court's would be were *it* considering this case: the subject matter of the expression that the Ordinance prohibits. However, this Court is applying the Maine, not the United States, Constitution, and our charter expressly vouchsafes to our citizens the freedom to speak *"on any subject."* The Court should apply at least the protection of constitutional-level scrutiny to this Ordinance to determine whether it is narrowly drawn to serve only a compelling State interest.[12]

Applying that standard myself, I agree with the Superior Court that the scope of this Ordinance is substantially overbroad in that it unavoidably encompasses material that the Maine Constitution protects. Thus, I would find it unconstitutional on its face, whether or not some material encompassed by it might constitutionally be banned under a more narrowly drawn ordinance.

The Ordinance's definition of prohibited material is based in part on consequences that may result from the material. However, they are consequences that the State clearly cannot prevent. First is the potential giving of "patent offense," which occurs when the material is "so offensive on its face as to be intolerable to the average person, applying contemporary community standards." Section 1(a)(4). We said in *John W.* that language may not be prohibited merely because it is distasteful, and I am unable to see how merely "offensive" expression should receive less protection,

especially when there is not the additional requirement of *John W.* and *State v. Porter* that substantive harm be likely to be caused by it. In this context, "intolerable" sets no standard since it might equally mean that which a fact-finder is incapable of tolerating or only that which the fact-finder is unwilling to tolerate. As Justice Harlan observed in *Cohen v. California*, "it is nevertheless often true that one man's vulgarity is another's lyric." 403 U.S. at 25, 91 S.Ct. at 1788. Our constitutional freedoms to speak and publish are not a quality control device. By design they guarantee that we may hear and see not only that which is pleasing to the eye and soothing to the ear, but that which may offend, challenge, and stimulate our senses. One need not view material of the type prohibited here if one will be offended by it. However, our Constitution leaves that decision up to our citizens rather than making it for them by permitting government to eliminate offensive materials that are not also harmful. Where a constitutional freedom is at stake, regulation of private activity must be based on consequences more harmful than moral offense or aesthetic distaste.

We are not here concerned with an ordinance limited to preventing the intrusion of sexually explicit material in the public domain where it is forced upon the unwilling in a manner that arguably constitutes an invasion of personal privacy that is a "present injury" to the viewer. *See* Z. Chafee, *Free Speech in the United States* 149 (1941); Tribe, *American Constitutional Law* 681 (1978).[13] Nor are we confront-

---

**12.** Though the scope of Article I, Section 4 is broader than that of the First Amendment by virtue of encompassing all subjects of expression, its application need be no different in any given case where the First Amendment would also offer protection. Thus, in *Solmitz v. Maine Sch. Admin. Dist. No. 59,* 495 A.2d 812 (Me.1985), where the lines were drawn over the circumstances in which the government may curtail protected expression, this Court correctly held that the First Amendment and Article I, Section 4 were "equally applicable." *Id.* at 816, n. 2.

**13.** *See also* the dissenting opinion of Justice Abrams in *Commonwealth v. Trainor,* 374 Mass. 796, 374 N.E.2d 1216, 1223–26 (1978), where she sets out an approach to the regulation of "obscenity" based primarily on the existence of intrusion upon the unwilling public. That approach has considerable appeal. However, I would not adopt it because I do not think it sufficiently flexible to take into account, except by making exceptions, the increasing evidence that some sexually explicit materials may, indeed, have a close relationship to harm that justifies their regulation by appropriate means.

ed with a "reasonable time, place, and manner" restriction as in a zoning ordinance that is intended to cure evils only indirectly related to the content of materials sold by "adult" stores.[14] Nor do we consider whether the City might constitutionally prevent dissemination of some material to children.[15] This Ordinance is a broad censorship of expression that extends to the viewing of material by "consenting adults" in private. Though we may presume that the banned material is acceptable to its consenting adult viewers and readers, the Ordinance's ban is based on the potential offense to others if they were to read or see it, *whether or not* they actually do. It is entirely possible that no "average person" would ever be exposed to the material seized in this case. Because the "harm" embodied in this part of the definition is only "patent offense," and only potential offense at that, there is not such a compelling state interest as may constitutionally be protected by an outright ban on the content of expression.

The other consequence on which the Ordinance's definition depends is an "appeal to the prurient interest in sex." I am unable to agree that the State has any authority at all to restrict the type of interest its citizens may have in sex. Clearly, the State may punish some harmful sex-related conduct. *See, e.g.,* 17–A M.R.S.A. §§ 251 *et seq.* However, the *Miller* standard incorporated in this Ordinance permits the State to punish expression that does no more than provoke "sexual responses over and above those that would be characterized as normal." *Brockett v. Spokane Arcades, Inc.,* —— U.S. ——, ——, 105 S.Ct. 2794, 2799, 86 L.Ed.2d 394 (1985). I note, as the Superior Court did, that with the

repeal of the criminal laws against fornication, adultery, and sodomy by P.L. 1975, ch. 499, there are now no purely sexual acts done in private between consenting adults that are prohibited. Even if there were, of course, the State could not, consistently with the First Amendment, let alone Article I, Section 4, proscribe their depiction solely on the basis that the film or literature portrayed them as socially acceptable or "normal." *Kingsley Int.'l Pictures Corp. v. Regents of N.Y. Univ.,* 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959). It is patently arbitrary, let alone unworkable in practice, for the State to limit sexually explicit expression to that which arouses "only normal, healthy sexual desires," *Brockett,* —— U.S. at ——, 105 S.Ct. at 2799, without any showing that the expression will cause substantive harm.

Apart from the language of the Ordinance itself, there is nothing before us to suggest that its drafters acted to prevent harms that the State *does* have a compelling interest in regulating. I see nothing to indicate that the Ordinance is designed to stem the abuse and exploitation of children (or even adult models used in pornographic photography[16]), as in the case of the statute upheld by the United States Supreme Court in *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).[17] Nor does it appear that the Ordinance is based on *any* empirical link, however tenuous, between the prohibited material and preventable injury to either its viewers and readers or to *their* potential victims.[18] In short, while I do not suggest that all materials covered by the Portland Ordinance would be exempt from regulation under a law that was narrowly drawn

---

**14.** *See, e.g., Young v. American Mini Theaters,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

**15.** *See, e.g., Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *Bookland of Maine, Inc. v. City of Lewiston,* No. CV–83–307 (Me.Sup.Ct., And. Co., Oct. 25, 1983).

**16.** *See, e.g., Jacobs, Patterns of Violence: A Feminist Perspective on the Regulation of Pornog-*

*raphy,* 7 Harvard Women's Law J. 5, 20–23 (1984); Katz, *Regulating Obscenity,* 5 Whittier L.R.1, 12 (1983); Tribe, *American Constitutional Law* 666, n. 62.

**17.** *Compare* 17 M.R.S.A. §§ 2921–2923 (1983 and Supp.1984).

**18.** *See, e.g.,* Katz, *Regulating Obscenity,* 5 Whittier L.R. at 19–20.

to address only "evils that Maine constitutionally may seek to prevent," I do not agree that the City may censor them under *this* Ordinance.

## VI.

This Court need not decide in the abstract how close a link the government must show between sexually explicit expression and the preventable harm in order to satisfy all overbreadth concerns. As a purely practical matter, the nexus may have to vary with the medium of expression and the asserted harm. While *State v. John W.* requires that the government prove that the spoken words presented a "clear and present danger" of preventable harm in their particular context in order to sustain a disorderly conduct conviction, it may be infeasible to require such a showing in any individual prosecution for disseminating sexually explicit pictures or written words.[19] In the case of preventable future harm, regulation may find no stronger basis than a statistical correlation between the harm and the material that the State seeks to prohibit. However, the governmental interest would have to be compelling, and the correlation close, in order to satisfy Article I, Section 4.

On the other hand, regulation of expression may, in certain circumstances, be undertaken after the fact of the harm. Indeed, the language of Article I, Section 4 might be read to contemplate regulation *only* in these circumstances. An example would be Title 17, Me.Rev.Stat.Ann., § 2923 (Supp.1984), which makes it a crime to disseminate visual depictions of a minor engaging in sexually explicit conduct. By the time such material reaches the marketplace, the preventable harm, sexual abuse or exploitation of a minor (*e.g.,* 17 M.R.S.A. § 2922 (1983))[20], will inevitably have occurred. The purpose of the legislation is to remove the financial incentive for the substantive harm. *Ferber* concerned a similar statute. There, the United States Supreme Court took one step towards a harm-based approach to the regulation of sexually explicit material by upholding the statute even as to material not meeting the *Miller* definition of "obscenity."

This approach is, of course, open to objection on the ground that government should proceed directly against the perpetrators of the substantive crime rather than suppressing expression by prosecuting the booksellers and cinemas that are far removed from the substantively harmful acts. Yet, because more direct methods of preventing sexual abuse of children are often ineffective, and because it must be virtually impossible to obtain materials falling within the ambit of 17 M.R.S.A. § 2923 without a crime having taken place, an overbreadth objection would be far more difficult to rationalize than in the case of pornography depicting adults.

Indeed, it is not unreasonable to assume that sociological research will someday show that even certain pornography containing only sexually explicit pictures of adults might be susceptible to regulation on the same grounds that support the Maine and New York "kiddie-porn" statutes. There is increasing evidence that the creation of some "adult" pornography is

19. *But see Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), in which Justice Holmes first articulated the "clear and present danger" test. Schenck *et al.* were convicted of distributing seditious leaflets in circumstances that, the Court felt, made the intended effect (interference with the draft) likely.

20. 17 M.R.S.A. § 2922(1) reads:

Offense. A person is guilty of sexual exploitation of a minor if:

A. Knowing or intending that the conduct will be photographed for commercial use, he intentionally or knowingly employs, solicits, entices, persuades, uses or compels another person, who is in fact a minor, to engage in sexually explicit conduct; or

B. Being a parent, legal guardian or other person having care or custody of another person, who is in fact a minor, he knowingly or intentionally permits that minor to engage in sexually explicit conduct, knowing or intending that the conduct will be photographed for commercial use.

accompanied by physical abuse and coercion.[21] With adults, of course, "questions of consent and willing participation are more ambiguous" than with children, Katz, *Regulating Obscenity* at 12, n. 76, and the problem of overbreadth with regulation of this type would be greater, though it may not be insurmountable.

That practical problems of proof persist does not, however, justify the broad censorship embodied in this Ordinance, even if the City would currently find it difficult to enact one more narrowly drawn. This Ordinance regulates on grounds in which the City has no legitimate, let alone compelling, interest. Because the Ordinance prohibits expression by definition of its content without regard to any actual harm the expression may cause, it is not amenable to a narrower construction that would ensure its application only in permissible cases. *Compare State v. John W.*, 418 A.2d at 1101–1103. For that reason, I would hold it unconstitutionally overbroad in violation of Article I, Section 4 of the Maine Constitution.

## OBSCENITY ORDINANCE

*Section 1. Definitions.*

(a) As used in this Chapter, the following words shall have the following meanings:

(1) "Obscene" means material or a performance that:

(A) the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

(B) depicts or describes:

(i) patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

(ii) patently offensive representations or descriptions of masturbation, excretory functions, sadism, maso-

chism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; and

(C) Taken as a whole, lacks serious literary, artistic, political, or scientific value.

(2) "Material" means anything tangible that is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound, or in any other manner, but does not include an actual three-dimensional obscene device.

(3) "Performance" means a play, motion picture, dance, or other exhibition performed before an audience.

(4) "Patently offensive" means so offensive on its face as to be intolerable to the average person, applying contemporary community standards.

(5) "Prurient interest in sex" means a shameful or morbid interest in sex.

(6) "Promote" means to manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, or advertise, or to offer or agree to do the same.

(7) "Wholesale promote" means to manufacture, issue, sell, provide, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, or to offer or agree to do the same for purpose of resale.

(8) "Obscene device" means a device including a dildo or artificial vagina, designed or marketed as useful primarily for the stimulation of human genital organs.

(b) If any of the depictions or descriptions of sexual conduct described in this section are declared by a court of competent jurisdiction to be unlawfully included herein, this declaration shall not invali-

---

**21.** *See, e.g.,* Colloquium, *Violent Pornography: Degradation of Women versus Free Speech,* 8

N.Y.U.Rev.L. & Soc. Change 181 (1979), as well as the sources cited at n. 17 of this dissent.

date this section as to other patently offensive sexual conduct included herein.

*Section 2. Obscenity.*

(a) A person commits an offense if, knowing its content and character, he wholesale promotes or possesses with intent to wholesale promote any obscene material or obscene device.

(b) An offense under Subsection (a) of this section is punishable by a penalty of not less than $50.00 nor more than $500.00. Each day an offense under Subsection (a) continues shall be a separate offense.

(c) A person commits an offense if, knowing its content and character he:

  (1) promotes or possesses with intent to promote any obscene material or obscene device; or

  (2) produces, presents, or directs an obscene performance or participates in a portion thereof that is obscene or that contributes to its obscenity.

(d) An offense under Subsection (c) of this section is punishable by a penalty of not less than $50.00 nor more than $500.00. Each day an offense under Subsection (c) continues shall be a separate offense.

(e) A person who promotes or wholesale promotes obscene material or an obscene device or possesses the same with intent to promote or wholesale promote it in the course of his business is presumed to do so with knowledge of its content and character.

(f) A person who possesses six or more obscene devices or six or more obscene articles, whether such devices or articles are similar or identical, is presumed to possess them with intent to promote the same.

(g) This section does not apply to a person who possesses or distributes obscene material or obscene devices or participates in conduct otherwise proscribed by this *section* when the possession, participation, or conduct occurs in the course of law enforcement activities.

*Section 3. Severability.*

If any provision of this Chapter is held to be unconstitutional or invalid for any reason by any court of competent jurisdiction, such holding shall not invalidate or otherwise affect the remaining provisions of this Chapter.